RICHARD M. FLIEHR, a/k/a
RIC FLAIR,

      Plaintiff,

v.

WORLD CHAMPIONSHIP
WRESTLING, INC.,

      Defendants.

**F I L E D**
CHARLOTTE, N.C.

**JUL 1 0 1998**

U.S. DISTRICT COURT
W. DIST. OF N.C.

**NOTICE OF REMOVAL**

    Defendant World Championship Wrestling, Inc. ("WCW") hereby gives notice of the removal of the above-styled action from the North Carolina General Court of Justice, Superior Court Division of Mecklenburg County (hereinafter referred to as "State Court"), to the United States District Court for the Western District of North Carolina, Charlotte Division, on the following grounds:

    1.    A civil action, designated 98-CVS-8351, was filed and on June 11, 1998 is now pending in the Superior Court Division of Mecklenburg County, North Carolina, in which WCW has been named the sole defendant.

    2.    Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings and orders received by removing defendants in this action are attached hereto as **Exhibit A**.

    3.    Pursuant to 28 U.S.C. § 1446(b), the time within which defendants are required to file this notice of removal has not yet expired. WCW received a copy of the plaintiff's initial pleading no earlier than June 11, 1998, and this notice of removal is being filed within thirty (30) days of WCW's receipt of the plaintiff's initial pleading. WCW was delivered a copy of the

Summons and Complaint in this action by the Sheriff of Fulton County, Georgia on July 8, 1998. The time for answering or otherwise responding to the complaint has not yet expired, and WCW reserves all defenses available to it including, without limitation, all service-related defenses.

4.     This Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and WCW, and, based on plaintiff's allegations contained in the complaint, the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

5.     The plaintiff is a natural person who is a citizen of the State of North Carolina.

6.     WCW is a corporation organized and existing under the laws of the State of Georgia, and has its principal place of business in the State of Georgia.

7.     Based on the foregoing, this action may be removed by WCW pursuant to 28 U.S.C. § 1441 in that the plaintiff has brought claims of which the district courts of the United States have original jurisdiction, and WCW, the sole defendant, is not a citizen of North Carolina.

8.     A true and accurate copy of this Notice will be filed in State Court promptly after filing with this Court.

WHEREFORE, WCW prays that this cause proceed in this Court as an action properly removed thereto.

This the 10th day of July, 1998.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 2 of 162

_Jonath E. Buch_

Jonathan E. Buchan
N.C. State Bar No. 8205
Thomas D. Myrick
NC State Bar No. 12645

SMITH HELMS MULLISS & MOORE, L.L.P.
201 North Tryon Street
Post Office Box 31247
Charlotte, North Carolina 28231
Telephone: (704) 343-2000

Attorneys for defendant World
Championship Wrestling, Inc.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 3 of 162

## CERTIFICATE OF SERVICE

I certify that the undersigned served the foregoing document upon the parties to this action by depositing copies thereof in the United States Mail, first class, postage prepaid, addressed to the following:

William K. Diehl, Jr.
Richard B. Fennell
JAMES, McELROY & DIEHL, P.A.
600 South College Street
Charlotte, NC 28202

This the 16 day of July, 1998.

Jonathan E. Buchan

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 4 of 162

**SHERIFF'S ENTRY OF SERVICE**

Civil Action No. _98 - C V S - 8 3 5 1_ in _Mecklenburg County, North Carolina_

Date Filed _____   **SUPERIOR COURT**

**GEORGIA, FULTON COUNTY**

_Richard M. Fliehr_

Attorney's Address

_William K. Diehl, Jr._
_600 South College St_
_Ste 3000_
_Charlotte, NC 28202_

Name and Address of Party to be Served

_Nicholas Lombros, Vice President_
_World Championship Wrestling, Inc._
_One CNN Center 1050 Techwood Dr._
_Atlanta, Ga. 30348_   05-10-51

**Plaintiff**

VS.

_World Championship_
_Wrestling, Inc._

**Defendant**

---

**SHERIFF'S ENTRY OF SERVICE**

**SHERIFF'S ENTRY OF SERVICE**

**PERSONAL**

☐ I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS**

☐ I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows

age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of

defendant.

**CORPORATION**

☒ Served the defendant _World Championship Wrestling, Inc_ a corporation

by leaving a copy of the within action and summons with ___ N. Harr Vcic ___

in charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**

☐ I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**

☐ Diligent search made and defendant not to be found in the jurisdiction of this Court.

This _8th_ day of _July_, 19 _98_.

**DEPUTY**

**SHERIFF DOCKET** _____ **PAGE** _____

WHITE-CLERK  CANARY-PLAINTIFF  PINK-DEFENDANT

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 5 of 162

SSC-85-2

6009-201-119

# STATE OF NORTH CAROLINA

**MECKLENBURG** County

File No. 98-CVS- *8351*

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name of Plaintiff*<br>RICHARD M. FLIEHR | |
| *Address* | **CIVIL SUMMONS** |
| *City, State, Zip* | |
| **VERSUS** | G.S. 1A-1, Rule 3, 4 |
| *Name Of Defendants*<br>WORLD CHAMPIONSHIP WRESTLING, INC. | ☐ Alias and Pluries Summons |
| | *Date Last Summons Issued*<br>/ / |

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Nicholas Lambros, Vice President or any other Director, Officer or Managing Agent<br>One CNN Center, Atlanta GA 30348 | |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name and Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>William K. Diehl, Jr.<br>600 South College St, Ste. 3000<br>Charlotte, NC 28202 | *Date Issued*<br>6-11-98 | *Time*<br>4:55 ☐ AM ☒ PM |
|---|---|---|
| | *Signature*<br>*Sally D. Allman* | |
| | ☐ Deputy CSC ☒ Assistant CSC ☐ Clerk of Superior Court | |

| ☐ **ENDORSEMENT**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended thirty (30) days. | *Date Issued* | *Time*<br>☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk of Superior Court | |

AOC CV-100
Rev. 6/95

# STATE OF NORTH CAROLINA

**MECKLENBURG** County

FILED

File No. 98-CVS- 8351

In The General Court Of Justice
☐ District   ☒ Superior Court Division

| Name Of Plaintiff 1 | |
|---|---|
| RICHARD M. FLIEHR | 1998 JUN 11   P 4: 55 |
| Tax ID/SSN | MECKLENBURG |
| | C.S.C. |

| Name Of Plaintiff 2 | |
|---|---|
| Tax ID/SSN | |

| Name Of Plaintiff 3 | |
|---|---|
| Tax ID/SSN | |

**GENERAL**

**CIVIL ACTION COVER SHEET**

☒ **INITIAL FILING**   ☐ **SUBSEQUENT FILING**

Rule 5(b), Rules of Practice For Superior and District Courts

**VERSUS**

| Name Of Defendant 1 | |
|---|---|
| WORLD CHAMPIONSHIP WRESTLING, INC. | |

| Tax ID/SSN | Summons Submitted |
|---|---|
| | ☒ Yes ☐ No |

| Name Of Defendant 2 | |
|---|---|
| Tax ID/SSN | Summons Submitted |
| | ☐ Yes ☐ No |

| Name Of Defendant 3 | |
|---|---|
| Tax ID/SSN | Summons Submitted |
| | ☐ Yes ☐ No |

Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)

William K. Diehl, Jr.
600 South College St, Ste. 3000
Charlotte, NC 28202

Attorney Bar No.
1187

☒ Initial Appearance In Case   ☐ Change Of Address

Name Of Firm
JAMES MCELROY & DIEHL, P.A.

| Tax ID No. | Telephone No. 704/372-9870 | Fax No. 704/333-5508 |
|---|---|---|

Counsel for
☒ All Plaintiffs ☐ All Defendants ☐ Only (List party(ies) represented)

---

Jury Demanded In Pleading?  ☐ No  ☒ Yes

☐ Amount in controversy does not exceed $15,000.
☐ Stipulate to arbitration.

| **TYPE OF PLEADING** (check that all apply) | **CLAIM FOR RELIEF FOR** |
|---|---|
| ☐ Amended Answer/Reply (AMND-Response) | ☐ Administrative Appeal (ADMA) |
| ☐ Amended Complaint (AMND) | ☐ Appointment of Receiver (APRC) |
| ☐ Answer/Reply (ANSW-Response) | ☐ Attachment/Garnishment (ATTC) |
| ☒ Complaint (COMP) | ☐ Claim and Delivery (CLMD) |
| ☐ Confession of Judgment (CNFJ) | ☐ Collection on Account (ACCT) |
| ☐ Counterclaim vs. (CTCL) | ☐ Condemnation (CNDM) |
| ☐ All Plaintiffs ☐ Only (List on Back) | ☐ Contract (CNTR) |
| ☐ Crossclaim vs. (List on Back) (CRSS) | ☐ Discovering Scheduling Order (DSCH) |
| ☐ Extend Statute of Limitations, Rule 9 (ESOL) | ☐ Injunction (INJU) |
| ☐ Extended Time For Answer (MEOT-Response) | ☐ Medical Malpractice (MDML) |
| ☐ Extended Time For Complaint (EXCO) | ☐ Minor Settlement (MSTL) |
| ☐ Rule 12 Motion In Lieu Of Answer (MDLA) | ☐ Money Owed (MNYO) |
| ☐ Third Party Complaint (List Third Party Defendants on Back) (TPCL) | ☐ Negligence - Motor Vehicle (MVNG) |
| | ☐ Negligence - Other (NEGO) |
| | ☐ Motor Vehicle Lein G.S. 44A (MVLN) |
| ☐ Other: (specify) | ☐ Limited Driving Privilege - Out of State Convictions (PLDP) |
| | ☐ Possession of Personal Property (POPP) |
| | ☐ Product Liability (PROD) |
| | ☐ Real Property (RLPR) |
| | ☐ Specific Performance (SPPR) |
| | ☒ Other: (specify) **Declaratory Judgment** |

| Date | Signature Of Attorney/Party |
|---|---|
| 6- 11-98 | Richard L__ |

NOTE: All Papers filed in civil actions, special proceedings and estates shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts. The Superior Court shall require a party to refile any paper which does not include the required coversheet.)

AOC-CV-751 New 10/96

FILED

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE

1998 JUN 11 PM 4: 55

            SUPERIOR COURT DIVISION

COUNTY OF MECKLENBURG   MECKLENBURG COUNTY, C.S.C.    98-CVS-_835 1_

BY: _____

| | |
|---|---|
| RICHARD M. FLIEHR, a/k/a Ric Flair,   ) | |
|                            ) | |
|     Plaintiff,                  ) | |
|                            ) | **COMPLAINT** |
| v.                                ) | |
|                            ) | **[Jury Trial Demanded]** |
| WORLD CHAMPIONSHIP         ) | |
| WRESTLING, INC.,            ) | |
|                            ) | |
|     Defendant.               ) | |

Plaintiff, complaining of Defendant, alleges and says:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff is an adult citizen and resident of Mecklenburg County.

2.     Defendant is a corporation existing under the laws of the State of Georgia, but doing business in North Carolina.

3.     This is an action for declaratory judgment and for damages in excess of $10,000.

4.     Jurisdiction and venue are proper in this court since Plaintiff resides in Mecklenburg County and Defendant does business here.

### FACTS

5.     Plaintiff is a well-known professional wrestler. He has wrestled for 25 years, and has been a champion on thirteen separate occasions.

6.     Defendant organizes and promotes wrestling events.

7.     On February 16, 1993, Plaintiff entered into a contract to wrestle for Defendant. The contract was 21 pages long, contains 11 sections and 51 subsections.

8.     The agreement, as amended, expired on February 15, 1998.

JMD: 158974

1

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 8 of 162

9.     Plaintiff began negotiating with Defendant regarding a new contract in the fall of 1996 and continuing throughout 1997.

10.    Plaintiff informed Defendant during the negotiations that he sought a three year agreement providing him a substantial income; a working environment and relationship with the WCW of fair treatment; reasonable involvement in the "story lines" part of professional wrestling; legitimate consideration of his twenty-five years of experience and his status as one of the most popular wrestlers in the world.

11.    Defendant assured Plaintiff that he would be provided all of the above as he requested, and further, that he would be treated during the three year period of a contract as the "Babe Ruth" of professional wrestling.

12.    Plaintiff relied upon the promises and assurances of the Defendant.

13.    Defendant sent a "proposed agreement" letter to Plaintiff on November 11, 1997 outlining "skeleton" terms of a future arrangement between the parties.   (Exhibit A).

14.    Plaintiff was assured by Defendant that Exhibit A was nothing more than an outline of basic economic terms of a future relationship between the parties.  As set forth in Exhibit A two comprehensive documents were to describe the actual contractual relationship between the parties.

15.    Plaintiff wanted to approve the comprehensive documents setting forth the contractual relationship between the parties, before he signed the more comprehensive documents. Accordingly, Plaintiff noted on the second page of Exhibit A (see Exhibit B), that the more comprehensive documents would be "subject to review and mutual acceptance" and initialed that note.

16.    Defendant received Exhibit A with the additional written language described above and then executed Exhibit A.  As executed by both parties, Exhibit A became Exhibit B, attached.

17.    On or about January 18, 1998, Defendant sent two draft agreements to Plaintiff's agents in Los Angeles.   The draft agreements were not acceptable to Plaintiff. Among other things, the agreements:

a.     Failed to contain paragraphs recognizing Plaintiff's experience and status as an internationally known wrestling champion;

b.     Failed to contain paragraphs involving Plaintiff in the "story line" of his wrestling matches;

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 9 of 162

c.     Failed to include requirements that the WCW and its representatives deal with Plaintiff in the operation of their business relationship in a civil and respectful manner;

d.     Contained new "agreements" never agreed to by the parties;

e.     Failed to contain provisions allowing reasonable vacation time;

f.     Failed to include provisions permitting Plaintiff to wrestle on a regular basis and containing provisions allowing the WCW to eliminate Plaintiff as a wrestler for three years if they paid him, literally destroying his career;

g.     Contained provisions not agreed to allowing Defendant (and others) to retain rights belonging to Plaintiff, beyond the term of the agreement;

h.     Contained provisions not agreed to requiring Plaintiff to indemnify Defendant for breaches of contract, but not providing for the reverse.

i.     Containing provisions allowing Defendant to cure alleged breaches, but not permitting Plaintiff to cure breaches;

j.     Failed to provide payments to Plaintiff in the event of his disability or incapacitation;

k.     Provided Plaintiff, an amount, not agreed to, less than the contract sum in the event Plaintiff were hurt, but prevented Plaintiff from working in another field to earn a living;

l.     Provided that Plaintiff had a sole remedy in the event of injury to accept workman's compensation and then provided that Defendant didn't have to carry workman's compensation insurance;

m.     Included an illegal non-compete clause after termination of the agreement "for any reason", including breach by Defendant;

n.     Permitted Defendant to assign the agreement without consent of Plaintiff;

o.     Required Plaintiff to license his name and wrestling titles exclusively to Defendant and permitted Defendant to sublicense Plaintiff's name without his consent; and

p.     Failed to provide adequate examination of Defendant's books and records to determine sums due Plaintiff under any licensing agreements.

18.     Plaintiff has not and will not execute the proposed comprehensive agreements.

19.     The parties continued their negotiations after January. During these negotiations, the parties' relationship deteriorated drastically. Defendant reduced the number of Plaintiff's appearances at its promotions. Plaintiff's appearances on Defendant's weekly television programs, "Thunder", "Nitro" and Pay Per View were de-emphasized and for over a month, completely eliminated. Upon information and belief, Plaintiff's role in such event was downplayed by Defendant's agents, in particular, Eric Bischoff, in order to satisfy demands made by, and commitments to, other wrestlers, including Terry "Hollywood" Hogan. Bischoff is purportedly Vice President of Defendant in charge of wrestling and simultaneously the self styled public spokesman and TV personality manager for one or more WCW wrestlers, including the "New World Order" and "Hollywood Hogan."

20.     Throughout the time period, Bischoff has been treating Plaintiff, off camera, in an increasingly hostile, rude, threatening and degrading manner. Bischoff asserts himself as a "czar" and seems to believe he has dictatorial authority over Plaintiff. His language is crude, rude and "socially unacceptable" even in the world of professional wrestling. He has threatened to bankrupt Plaintiff, put Plaintiff out of work, banish him to some foreign country and has referred to him as "garbage."

21.     An actual controversy exists between the parties. Defendant has filed an action in Fulton County Superior Court in Atlanta, Georgia, alleging that Exhibit B constitutes a binding agreement, that Plaintiff has breached it, and that Defendant is entitled to damages in excess of $2,000,000.

### FIRST CAUSE OF ACTION
### Declaratory Judgment

22.     Paragraphs 1 through 21 are restated and realleged as if fully set out.

23.     Pursuant to N.C.G.S. §1-253, Plaintiff is entitled to a declaration that the document attached as Exhibit B is not a binding agreement between the parties, and does not obligate the parties in any way, and there are no contractual relationships between Plaintiff and Defendant.

### SECOND CAUSE OF ACTION
### Interference With Prospective
### Economic Advantage

24.     Paragraphs 1 through 23 are restated and realleged as if fully set out.

25.     Defendant's primary competitor is known as the World Wrestling Federation ("the WWF").

26. Upon information and belief, Defendant is aware that Plaintiff had discussions with the WWF after it became clear that Plaintiff and Defendant would not finalize an agreement.

27. Defendant's filing of the civil action in state court in Georgia is groundless, and, upon information and belief, is intended to chill any further discussions between Plaintiff and the WWF.

28. Upon information and belief, the WWF is not willing to enter into any agreement with Plaintiff during the pendency of this litigation. Plaintiff has suffered damage as a result.

29. Plaintiff's exact loss is as yet undetermined, but upon information and belief, it will exceed $2,000,000.

### THIRD CAUSE OF ACTION
### Unfair Trade Practices

30. Paragraphs 1 through 29 are restated and realleged as if fully set out.

31. Defendant's actions are, in and affecting, commerce.

32. Defendant's actions are unfair and deceptive, and are proscribed by N.C.G.S. §75-1.1.

33. Plaintiff has suffered damage as a result.

34. Plaintiff's exact loss is as yet undetermined, but upon information and belief, it will exceed $2,000,000.

### FOURTH CAUSE OF ACTION (ALTERNATIVE)
### Recission/Reformation

35. Paragraphs 1 through 34 are restated and realleged as if fully set out.

36. Plaintiff signed Exhibit B based on assurances by Defendant's agents that final agreements between the parties containing certain provisions would be executed at a later date.

37. Upon information and belief, these representations were false when made, and Defendant had no intentions of fulfilling its promises.

38. Defendant intended for Plaintiff to rely on these representations.

39. Plaintiff in fact relied on these representations to his detriment in signing Exhibit B.

40. If the Court should hold that the letter attached as Exhibit B is a binding agreement, Plaintiff is entitled to an order rescinding it, or in the alternative, reforming the document to reflect the true agreement of the parties.

## FIFTH CAUSE OF ACTION (ALTERNATIVE)
### Breach of Contract

41. Paragraphs 1-40 are restated and realleged as if fully set out.

42. If the Court should hold that Exhibit B is a binding agreement, Defendant has breached it as set forth in paragraph 19.

43. Plaintiff has suffered damage as a result in an amount to be determined at trial, but, upon information and belief, in excess of $2,000,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court:

1. To enter a judgment declaring that Exhibit B does not bind the parties and there are no contractual relations between Plaintiff and Defendant;

2. In the alternative, to rescind any agreement represented by Exhibit B as fraudulently induced, or to reform it to reflect the true agreement of the parties;

3. To conduct a hearing on Plaintiff's first cause of action at the Court's earliest convenience, pursuant to Rule 57 of the North Carolina Rules of Civil Procedure;

4. For damages in excess of $10,000;

5. To treble any damage award;

6. To tax the costs of this action, including a reasonable attorneys' fee, against Defendant;

7. For a trial by jury for causes of action 2, 3, 4, and 5 but not the request for declaratory judgment;

8. For such other relief as the Court deems appropriate.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 13 of 162

This __ll__ day of June, 1998.

JAMES, McELROY & DIEHL, P.A.

By: _William K Diehl_ Jr. by RBF
    William K. Diehl, Jr.

By: _Richard L_
    Richard B. Fennell
    600 South College Street
    Charlotte, NC 28202
    Telephone: 704/372-9870
    Attorneys for Plaintiff

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 14 of 162



**A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.**
ONE CNN CENTER. Box 105366, Atlanta, GA 30348-5366
(404) 827-2066   Fax: (404) 827-2931

November 5, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: <u>Letter of Agreement</u>

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1.  **SERVICES:** During the Term, you will provide wrestling and wrestling related services as required by WCW within the Territory. During the Term, you will not provide services to any third party or organization in the Territory.

2.  **TERM AND TERRITORY:** The Territory shall be the World. The Term of this Agreement shall be for three (3) years beginning on February 16, 1998 and continuing through February 15, 2001.

3.  **CONSIDERATION:** During the term, WCW shall compensate you according to the following schedule:

    Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
    Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
    Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

    The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearance Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you shall receive additional compensation at the rate of $3,750 per Appearance Date.

4.  **TRAVEL EXPENSES:** During the Term, when required to travel hereunder for WCW, WCW shall provide Hotel Accommodations and First Class Air Transportation for all Appearance Dates outside of your Home Base. In addition, you shall be credited $400.00 per Appearance Date worked for limousine transportation. The limousine transportation credit shall be included in the bi-weekly compensation payments.

5.  **MERCHANDISING:** WCW shall have exclusive licensing and merchandising rights within the Territory.

6.  **HOME BASE:** Charlotte, North Carolina.

**EXHIBIT**

A

**A Time Warner Company**

7. **CONFIDENTIALITY:** You shall keep the terms of this agreement confidential and shall not disclose or discuss them with anyone other than your spouse, attorney/agent and or accountant who shall, in turn, agree not to disclose the terms.

8. **GENERAL TERMS:** (a) You hereby represent and warrant to WCW as follows: (1) You have the full power, authority, ability and legal right to execute and deliver this Agreement and to perform your obligations hereunder; (2) this Agreement constitutes your legal, valid and fully binding obligation and is enforceable in accordance with its terms; (3) the execution, delivery and performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorized by the same, will not contravene any law, regulation, judgment or decree applicable to you, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which you are a party; (4) there are no pending claims or litigation which would or might interfere with the performance of your obligations or the enjoyment of WCW's rights under this Agreement; and (5) you are not currently using, and during the Term of this Agreement, shall not use any illegal drugs, steroids or other substances prohibited by WCW.

(b) You agree to abide by the terms and conditions of the WCW Substance Abuse Policy which you agree you have received and reviewed.

(c) You agree to indemnify, defend and hold harmless WCW, its directors, officers, shareholders and their respective agents, officers and employees, against any and all suits, damages, expenses (including, without limitation, court costs and reasonable attorneys' fees), losses, liabilities and claims of any kind, caused by or resulting from any breach of this agreement or by any other act or omission of yours whether the same may be the result of negligence, willful act, responsibility under strict liability standards any other substandard conduct or otherwise.

Formal Independent Contractor and Merchandising Agreements containing the terms as set forth above, as well as WCW's standard terms (to the extend they do not conflict with the terms herein), shall be prepared by WCW and signed by the parties. Until such time as such formal agreements are executed by the parties, this Letter of Agreement shall govern and be fully enforceable and legally binding between the parties.

If the foregoing is in accordance with your understanding and agreement, please indicate your approval and acceptance hereof by signing in the space provided below and returning this letter to me.

Sincerely,                                        AGREED TO AND ACCEPTED:

Nicholas Lambros
Vice President/Asst. General Manager          Richard M. Fliehr

WCW

A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366
(404) 827-2066   Fax (404) 827-2931

November 11, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: <u>Letter of Agreement</u>

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World
Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1.   **SERVICES:** During the Term, you will provide wrestling and wrestling related services
required by WCW within the Territory. During the Term, you will not provide services to any
third party or organization in the Territory.

2.   **TERM AND TERRITORY:** The Territory shall be the World. The Term of this
Agreement shall be for three (3) years beginning on February 16, 1998 and continuing through
February 15, 2001.

3.   **CONSIDERATION:** During the term, WCW shall compensate you according to the
following schedule:

Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearance
Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you shall
receive additional compensation at the rate of $3,750 per Appearance Date.

4.   **TRAVEL EXPENSES:** During the Term, when required to travel hereunder for WCW,
WCW shall provide Hotel Accommodations and First Class Air Transportation for all
Appearance Dates outside of your Home Base. In addition, you shall be credited $500.00 per
Appearance Date worked for limousine transportation. The limousine transportation credit shall
be included in the bi-weekly compensation payments.

5.   **MERCHANDISING:** WCW shall have exclusive licensing and merchandising rights
within the Territory.

6.   **HOME BASE:** Charlotte, North Carolina.

EXHIBIT

B

7.   **CONFIDENTIALITY:** You shall keep the terms of this agreement confidential and sha: not disclose or discuss them with anyone other than your spouse, attorney/agent and or accountant who shall, in turn, agree not to disclose the terms.

8.   **GENERAL TERMS:** (a) You hereby represent and warrant to WCW as follows: (1) Y: have the full power, authority, ability and legal right to execute and deliver this Agreement and perform your obligations hereunder; (2) this Agreement constitutes your legal, valid and fully binding obligation and is enforceable in accordance with its terms; (3) the execution, delivery a performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorized by the same, will not contravene any law, regulation, judgment or decree applicable to you, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which you are a party, (4) the: are no pending claims or litigation which would or might interfere with the performance of yo: obligations or the enjoyment of WCW's rights under this Agreement; and (5) you are not currently using, and during the Term of this Agreement, shall not use any illegal drugs, steroid or other substances prohibited by WCW.

(b) You agree to abide by the terms and conditions of the WCW Substance Abuse Policy wh: you agree you have received and reviewed.

(c) You agree to indemnify, defend and hold harmless WCW, its directors, officers, sharehol!. and their respective agents, officers and employees, against any and all suits, damages, expens: (including, without limitation, court costs and reasonable attorneys' fees), losses, liabilities and claims of any kind, caused by or resulting from any breach of this agreement or by any other a: or omission of yours whether the same may be the result of negligence, willful act, responsibil: under strict liability standards any other substandard conduct or otherwise.

*If subject to review and mutual acceptance.* Formal Independent Contractor and Merchandising Agreements containing the terms as set fo: above, as well as WCW's standard terms (to the extend they do not conflict with the terms herein), shall be prepared by WCW and signed by the parties. Until such time as such formal agreements are executed by the parties, this Letter of Agreement shall govern and be fully enforceable and legally binding between the parties.

If the foregoing is in accordance with your understanding and agreement, please indicate your approval and acceptance hereof by signing in the space provided below and returning this lette: me.

Sincerely,                                    AGREED TO AND ACCEPTED:


Nicholas Lambros                              Richard M. Flieh:
Vice President/Asst. General Manager

**CIVIL COVER SHEET**      Receipt # 83018      FILE IN TRIPLICATE

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I(a) PLAINTIFFS
Richard M. Fliehr, a/k/a Ric Flair

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Mecklenburg, NC

(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS
World Championship Wrestling, Inc.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ Fulton, GA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
William K. Diehl, Jr.
Richard B. Fennell
James, McElroy & Diehl, P.A.
600 South College Street
Charlotte, NC 28202

ATTORNEYS (IF KNOWN)
Jonathan E. Buchan
Thomas D. Myrick
Mark R. McGrath
Smith Helms Mulliss & Moore
Post Office Box 31247
Charlotte, NC 28231-1247

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject to a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
This removal is being filed pursuant to 28 U.S.C. §§ 1332 and 1441. Plaintiff's claims include claims for declaratory judgment, economic advantage, unfair trade practices, rescission, and breach of contract.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

**PERSONAL INJURY**
☐ 362 Personal Injury—Med Malpractice
☐ 365 Personal Injury—Product Liability
☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Other

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)
☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23
DEMAND In excess of $2,000,000
Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY
JUDGE _____   DOCKET NUMBER _____

DATE  7-10-98     SIGNATURE OF ATTORNEY OF RECORD  Jonah E Buchan

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. (a) Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c) Attorneys. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V. Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI. Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII. Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Related Cases. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

(rev. 07/89)

GPO : 1989 - 237-312

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

APR 17 1998

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

WORLD CHAMPIONSHIP WRESTLING, )
INC., )
)
Plaintiff, )      CIVIL ACTION FILE
)
)      NO. _E·67926_
v. )         A20 / 360
)
RICHARD M. FLIEHR a/k/a RIC FLAIR, )
)
Defendant. )

## COMPLAINT

World Championship Wrestling, Inc. ("WCW") files its Complaint against Richard M.

Fliehr a/k/a/ Ric Flair as follows:

1.

WCW is a corporation existing under the laws of the State of Georgia. WCW is in the

business of arranging and promoting professional wrestling events.

2.

Defendant Flair is a resident of the State of North Carolina and may be served at his

address of 2722 Plantation Road, Matthews, North Carolina 28270. Flair is subject to the

jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91 and by virtue of his voluntary

submission to the jurisdiction of this Court.

3.

Venue is proper in this Court.

0249949.01

4.

WCW organizes and promotes professional wrestling events worldwide. WCW presents

monthly pay-per-view wrestling shows that are telecast throughout the United States. In addition

to its pay-per-view programming, WCW presents three cable television programs featuring

professional wrestling: "Monday Nitro," which airs live on Monday nights; "Thunder" which

airs live on Thursday nights and "WCW Saturday Night," which airs on Saturday nights. WCW

also has two television shows, "WCW Worldwide" and "WCW Pro" which are in syndication on

186 different stations nationwide. WCW also sells home videos of its pay-per-view events and

presents, throughout the United States, and in Europe and Asia, "in-house" non-televised

professional wrestling events.

5.

Flair is a professional wrestler. With the exception of one year, Flair has wrestled for

WCW since 1988. During this period Flair also was a member of and, for a time, the head of

WCW's booking committee. As a member of and as head of WCW's booking committee, Flair

was involved in the development of story lines involving various WCW wrestlers. These story

lines are developed in advance and require the cooperation of all wrestlers involved in order to be

properly executed.

6.

On or about November 11, 1997, Flair entered into a binding letter agreement with WCW

(hereinafter "the Letter Agreement"). The Letter Agreement set forth the principal terms of a

new Independent Contractor Agreement between WCW and Flair pursuant to which Flair would

continue to provide wrestling services to WCW through February 15, 2001. A true and correct

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 22 of 162

copy of the Letter Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

<p style="text-align:center">7.</p>

At the time Flair executed the Letter Agreement, Flair was currently engaged as an independent contractor by WCW through and including February 15, 1998 pursuant to an Independent Contractor Agreement dated February 16, 1993, as amended. A true and correct copy of this Independent Contractor Agreement and its amendments are attached hereto as Exhibit "B" and incorporated herein by reference.

<p style="text-align:center">8.</p>

The Letter Agreement expressly stated that it would be binding pending the execution of a complete Independent Contractor Agreement, a draft of which was forwarded to Flair's agents on or about January 19, 1998. A true and correct copy of the draft Independent Contractor Agreement is attached hereto as Exhibit "C" and incorporated herein by reference.

<p style="text-align:center">9.</p>

Pursuant to the Letter Agreement, Flair agreed that he would provide wrestling and wrestling related services as required by WCW. Flair further agreed that he would wrestle exclusively for WCW and further agreed that he would not provide any services to any other third party or organization during the term of the Agreement.

<p style="text-align:center">10.</p>

Pursuant to the Letter Agreement, Flair agreed to appear the maximum number of 220 Appearance Dates during the first year of its term.

0249949.01

<p style="text-align:center">3</p>

11.

Until April 9, 1998, both parties performed pursuant to the terms of the Letter Agreement. In reliance on Flair's performance and contractual agreement to appear the maximum of 220 dates, WCW has scheduled and plans to continue to schedule Flair for appearances at events to fulfill his part in appropriate story lines.

12.

Pursuant to the Letter Agreement, Flair was scheduled to appear for WCW's nationally televised "Thunder" program in Tallahassee, Florida on April 9, 1998, which was telecast live. Flair informed WCW that for personal reasons he would not appear at this event. To accommodate Flair, WCW arranged at its expense for a private jet to transport Flair to Tallahassee and back after the show. Despite these arrangements, Flair, without notice or excuse, failed and refused to appear at and perform in this event. Flair's failure to appear caused WCW to have to re-work the content of this live program on extremely short notice.

13.

Flair was next scheduled to appear in Minneapolis, Minnesota on Monday, April 13, 1998 for WCW's nationally televised program "Monday Nitro," which also was telecast live. Flair, again without notice or excuse, failed and refused to appear at and perform in this event.

14.

Flair was next scheduled to appear at a television taping in Mankato, Minnesota on April 14, 1998. Flair again failed and refused to appear at and perform in this event.

15.

On April 15, 1998, Flair was scheduled to appear at a live event that was not televised in Duluth, Minnesota. Flair again refused to appear at and perform in this event.

4

0249949.01

16.

As a former member of WCW's booking committee, Flair is aware that as part of its presentation of events, WCW creates various story lines involving certain wrestlers competing against other wrestlers. Flair also is aware that these story lines are planned out in advance and require the cooperation and participation of all involved wrestlers.

17.

At the time of Flair's refusal to appear and perform in these events, WCW had been developing a new story line involving several wrestlers. Flair was to be a key participant in this new story line involving the reinstatement of the highly successful "Four Horsemen" wrestling group, of which Flair was to be the leader. Without Flair, WCW could not introduce this story line which was to culminate in one or more pay-per-view main event matches. Flair's refusal to perform in scheduled events in contravention of his contractual responsibilities significantly disrupted WCW's ability to introduce its planned story line causing significant loss of time, money and effort by WCW.

18.

Upon information and belief, and despite his agreement to wrestle exclusively for WCW through February 16, 2001, Flair has engaged in discussions with WCW's primary competitor, the World Wrestling Federation (the "WWF"), about offering his wrestling services to the WWF. Flair has wrongly asserted that he is not bound by the Letter Agreement in general and, in particular, his agreement to wrestle exclusively for WCW during the term of the Letter Agreement.

5

0249949.01

19.

WCW stands ready, willing and able to continue to use Flair and continues to compensate him as agreed pursuant to the Letter Agreement.

## COUNT I

## BREACH OF CONTRACT - CLAIM FOR DAMAGES

20.

WCW incorporates herein and realleges, as if fully set forth in this paragraph, the allegations contained in paragraphs 1 through 19 above.

21.

WCW hereby expressly affirms the Letter Agreement and reasserts that it has heretofore fully performed and is ready, willing and able to perform thereunder. WCW further shows that it continues to compensate Flair under the terms of the Letter Agreement and maintains that the Letter Agreement remains in force. WCW has performed all conditions precedent in order to proceed with this action and continues to perform in accordance with the Letter Agreement.

22.

Flair's conduct described herein constitutes a material breach of the Letter Agreement. As a result of Flair's breach, WCW has suffered damages in an amount to be proven at trial but not less than $2,000,000.00.

23.

Pursuant to paragraph 8(c) of the Letter Agreement, Flair agreed to indemnify WCW for all costs, losses and reasonable attorneys' fees caused by or resulting from any breach of the Letter Agreement.

6

0249949.01

24.

As a result of Flair's breach of the Letter Agreement, WCW is entitled to recover all costs, losses, and reasonable attorneys' fees incurred by it in connection with this action in an amount to be proven at trial.

## COUNT II

## BREACH OF CONTRACT - CLAIM FOR PERMANENT INJUNCTIVE RELIEF

25.

WCW incorporates and realleges, as if fully set forth in this paragraph, the allegations contained in paragraphs 1 through 24 above.

26.

Pursuant to the Letter Agreement, Flair agreed that he would not provide services to any third party or organization during the term of the Letter Agreement.

27.

Flair's conduct described herein constitutes a breach of his obligation to provide services exclusively to WCW during the term of the Letter Agreement.

28.

WCW is entitled to a permanent injunction enjoining Flair from offering or providing services to any third party or organization during the term of the Letter Agreement.

## COUNT III

## BAD FAITH AND STUBBORN LITIGIOUSNESS

29.

WCW incorporates herein and realleges, as if fully set forth in this paragraph, the allegations contained in paragraphs 1 through 28 above.

7

0249949.01

30.

Flair's conduct described herein, including but not limited to his lack of professionalism, his open disregard for his contractual obligations, and his willful refusal to perform constitute bad faith and stubborn litigiousness, thereby entitling WCW to recover its attorneys' fees in connection with this action pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, WCW respectfully requests:

(a)     That pursuant to Count I, this Court enter a judgment for compensatory damages in an amount to be proven at trial but not less than $2,000,000.00, plus pre-judgment interest at the maximum rate allowed by law;

(b)     That pursuant to Count I, this Court enter a judgment granting WCW all costs, losses and reasonable attorneys' fees incurred in connection with this action in an amount to be proven at trial pursuant to paragraph 8(c) of the Letter Agreement;

(c)     That pursuant to Count II, this Court enter a permanent injunction enjoining Flair from offering or providing services to any third party or organization during the term of the Letter Agreement;

(d)     That pursuant to Count III, this Court grant WCW all of its expenses of litigation, including attorneys' fees, as a result of Defendant's bad faith and stubborn litigiousness;

(e)     That this Court enter a judgment granting WCW all costs incurred in this action;

(f)     That this Court enter a judgment allowing all other interest allowable by law; and

(g)     That this Court grant WCW such other and further relief as this Court deems just and proper.

8

0249949.01

Respectfully submitted this /7th day of April, 1998.

TROUTMAN SANDERS LLP

JAMES A. LAMBERTH
Georgia Bar No. 431851
DAVID C. VIGILANTE
Georgia Bar No. 727634

TROUTMAN SANDERS LLP
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia  30308-2216
(404) 885-3000

9

WCW

A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366
(404) 827-2068   Fax (404) 827-2931

November 11, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: Letter of Agreement

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1. **SERVICES:** During the Term, you will provide wrestling and wrestling related service required by WCW within the Territory. During the Term, you will not provide services to an third party or organization in the Territory.

2. **TERM AND TERRITORY:** The Territory shall be the World. The Term of this Agreement shall be for three (3) years beginning on February 16, 1998 and continuing throug February 15, 2001.

3. **CONSIDERATION:** During the term, WCW shall compensate you according to the following schedule:

Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearanc Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you sh receive additional compensation at the rate of $3,750 per Appearance Date.

4. **TRAVEL EXPENSES:** During the Term, when required to travel hereunder for WC WCW shall provide Hotel Accommodations and First Class Air Transportation for all Appearance Dates outside of your Home Base. In addition, you shall be credited $500.00 p Appearance Date worked for limousine transportation. The limousine transportation credit be included in the bi-weekly compensation payments.

5. **MERCHANDISING:** WCW shall have exclusive licensing and merchandising righ within the Territory.

6. **HOME BASE:** Charlotte, North Carolina.

A Time Warner Company

7. **CONFIDENTIALITY:** You shall keep the terms of this agreement confidential and sha: not disclose or discuss them with anyone other than your spouse, attorney/agent and or accountant who shall, in turn, agree not to disclose the terms.

8. **GENERAL TERMS:** (a) You hereby represent and warrant to WCW as follows (1) Yc have the full power, authority, ability and legal right to execute and deliver this Agreement and perform your obligations hereunder; (2) this Agreement constitutes your legal, valid and fully binding obligation and is enforceable in accordance with its terms; (3) the execution, delivery a performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorized by the same, will not contravene any law, regulation, judgment or decree applicable to you, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which you are a party; (4) the: are no pending claims or litigation which would or might interfere with the performance of yo obligations or the enjoyment of WCW's rights under this Agreement; and (5) you are not : currently using, and during the Term of this Agreement, shall not use any illegal drugs, steroic or other substances prohibited by WCW.

(b) You agree to abide by the terms and conditions of the WCW Substance Abuse Policy whi you agree you have received and reviewed.

(c) You agree to indemnify, defend and hold harmless WCW, its directors, officers, sharehold: and their respective agents, officers and employees, against any and all suits, damages, expens: (including, without limitation, court costs and reasonable attorneys' fees), losses, liabilities and claims of any kind, caused by or resulting from any breach of this agreement or by any other a or omission of yours whether the same may be the result of negligence, willful act, responsibl under strict liability standards any other substandard conduct or otherwise.

*If subject and to review to mutual acceptance.* Formal Independent Contractor and Merchandising Agreements containing the terms as set fc. above, as well as WCW's standard terms (to the extend they do not conflict with the terms herein), shall be prepared by WCW and signed by the parties. Until such time as such formal agreements are executed by the parties, this Letter of Agreement shall govern and be fully enforceable and legally binding between the parties.

If the foregoing is in accordance with your understanding and agreement, please indicate your approval and acceptance hereof by signing in the space provided below and returning this lette. me.

Sincerely,

Nicholas Lambros
Vice President/Asst. General Manager

AGREED TO AND ACCEPTED:

Richard M. Flich:

<u>INDEPENDENT CONTRACTOR AGREEMENT</u>

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made as of the 16th day of February, 1993, by and between WORLD CHAMPIONSHIP WRESTLING, INC., a Georgia corporation (hereinafter "PROMOTER"), and RICHARD M. FLIEHR (hereinafter "WRESTLER") whose ring name is Ric Flair.

In consideration of the mutual covenants and agreements hereinafter set forth, it is hereby agreed as follows:

## 1. <u>GRANT OF RIGHTS</u>

1.1 During the term of this Agreement, WRESTLER hereby grants exclusively to PROMOTER the following worldwide rights:

(a) To book WRESTLER for and to arrange WRESTLER's performance at wrestling events, engagements, promotions, matches and appearances of any type at which WRESTLER appears or performs services as a professional WRESTLER, whether such services include wrestling services or not (collectively, the "Events"), and whether the Events are staged before a live audience, in a broadcast studio (for later, delayed broadcast or otherwise), in any other location or otherwise;

(b) To sell or otherwise distribute tickets of admission to the general public to any or all of the Events;

(c) To publish, distribute, broadcast, photograph, film, tape or otherwise record, or to authorize others to do so, by any media now known or hereafter developed, any or all of the Events (any such broadcast, film, tape or other recording is referred to herein as a "Program");

(d)   To use WRESTLER'S name and image to promote, advertise or otherwise publicize the Events, PROMOTER or WRESTLER; and

(e)   To solicit, negotiate and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER's merchandising, commercial tie-in, publishing, endorsement and similar rights, and for personal appearances by WRESTLER and/or WRESTLER's performance in non-wrestling events (collectively referred to as the "Rights") including without limitation agreements involving WRESTLER, his ring name, his likeness and/or any other distinctive or identifying indicia, subject to the terms of that certain Merchandising Permission Agreement of even date hereof and executed concurrently herewith.

1.2.   (a)   PROMOTER shall have the perpetual exclusive right to use, exhibit, distribute or license throughout the world any Program or part thereof in which WRESTLER's services are utilized in any form of media which is now known or may hereafter exist, or otherwise exploit such Programs in such forums and for such uses as it deems appropriate.   Except as otherwise specifically set forth hereunder, all revenues derived by PROMOTER from the use, exhibition, distribution, licensing or other exploitation of such Programs shall be the sole and exclusive property of PROMOTER perpetually.

(b)   All Programs, recordings and work product made pursuant to this Agreement and WRESTLER's contributions thereto (hereinafter referred to as "Works") shall belong solely and exclusively to PROMOTER.   To the extent that such Works are considered: (i) contributions to collective works and/or (ii) as parts or components of audio-visual works, the parties hereby

2.

expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries. WRESTLER shall execute, verify, acknowledge, deliver and file any and all formal assignments, recordations and any and all other documents which PROMOTER may prepare and reasonably call for to give effect to the provisions of this Agreement. To the extent that WRESTLER refuses or is unable to execute such further documents, WRESTLER hereby appoints PROMOTER as his attorney-in-fact for the purposes of executing such documents.

    1.3 It is expressly understood that the rights granted to PROMOTER in Paragraph 1.2 shall continue in effect after the termination, expiration or nonrenewal of this Agreement to the extent necessary for PROMOTER's full enjoyment of such rights.

## 2. TRADEMARK LICENSE

    For the term of this Agreement and, as provided hereunder, thereafter, WRESTLER grants to PROMOTER the exclusive license and right to the use of WRESTLER's service marks, trademarks, trade names and any and all of his other distinctive and identifying

3

indicia, including without limitation his name, ring names, likeness, voice, signature, costumes, props, gimmicks, routines, themes, character and caricatures as used by or associated with WRESTLER in the business of professional wrestling (collectively, the "Intellectual Property"). The rights granted PROMOTER hereunder include the right to sublicense, promote, advertise, publicize, exploit and otherwise use the Intellectual Property in any commercial manner now known or hereafter devised. WRESTLER agrees to notify PROMOTER of any unauthorized use of the Intellectual Property promptly as it comes to WRESTLER's attention. PROMOTER shall have the sole and exclusive right to bring claims against such unauthorized infringements and to collect and retain any monetary awards therefrom, which right shall be exercised or not exercised in PROMOTER's sole discretion; provided, however, that WRESTLER shall be entitled to bring any such claims with PROMOTER's written permission should PROMOTER choose not to do so.

### 3.   MERCHANDISING RIGHTS

Certain terms of the agreement between WRESTLER and PROMOTER regarding merchandising activities are set forth in that certain Merchandising Permission Agreement of even date hereof and executed concurrently herewith, which is incorporated herein by this reference. In the event of any conflict or discrepancy between the terms hereof and the Merchandising Permission Agreement, the terms hereof shall govern.

4.

## 4. EXCLUSIVITY

The rights and licenses granted to PROMOTER by WRESTLER in Paragraphs 1, 2 and 3 hereof, and any and all other rights herein granted to PROMOTER during the term of this Agreement, are exclusive to PROMOTER even to the exclusion of WRESTLER during the term of this Agreement. Notwithstanding the foregoing, it is acknowledged that WRESTLER has granted certain rights and licenses to PROMOTER under a Memorandum of Agreement dated May 1, 1985, as amended, and a Merchandising Permission Agreement dated December 20, 1990, to Baggy Boy's Clothes and to World Wrestling Federation ("WWF") prior to the effective date of this Agreement. WRESTLER agrees to use his best efforts to obtain and provide to PROMOTER copies of agreements and/or other documents evidencing such preexisting rights and licenses. It is further acknowledged that WRESTLER has an ownership interest in Ric Flair's Gold's Gym in Charlotte, North Carolina and has plans to do promotional work for Gold's Gym and to open other gyms and shall be entitled to use and authorize the use of his name, ring name, likeness and voice in connection with the operation and promotion of such businesses and the sale of merchandise in connection therewith. Additionally, WRESTLER may provide occasional professional wrestling services to a bona fide third party wrestling organization other than WWF during the term of this Agreement provided that: (i) WRESTLER obtains express prior written permission from PROMOTER in all instances and (ii) the performance of any such other services shall not interfere with WRESTLER's full and timely performance of all of his obligations under this Agreement.

5

The expiration, nonrenewal or termination of this or any
other agreement shall in no way limit, invalidate or otherwise
affect the exclusivity of any rights licensed by PROMOTER during
the term hereof (or any extension) to a third party, even if the
term of such agreement with such third party continues beyond the
date of expiration, nonrenewal or termination of this Agreement.
It is the specific intent of this Agreement that any such third
party agreement shall remain in full force and effect through its
initial term and any renewal thereof, notwithstanding the
expiration or termination of this Agreement or the Merchandising
Permission Agreement, or any other agreement between the parties.

## 5.   TERM AND TERRITORY

5.1  The term of this Agreement shall be three (3) years,
from February 16, 1993 through February 15, 1996, unless sooner
terminated as hereinafter provided.  The term of this Agreement
shall be divided into nine (9) consecutive four (4) month periods
("cycles").  During cycles six (6) through nine (9), PROMOTER or
WRESTLER may terminate this Agreement for any reason or no reason
after giving to the other party at least thirty (30) days prior
written notice of termination, said termination to be effective
at the end of the then current (4) month cycle.

5.2  The territory of this Agreement shall be the world.

5.3  Upon giving WRESTLER at least thirty (30) days notice
prior to the end of the initial term, PROMOTER shall have the
option to extend the term of this Agreement for a period of one
(1) year under the same terms and conditions as exist during the

6.

initial term including, but not limited to, compensation, termination, and exclusivity.

## 6.  CONSIDERATION

6.1  (a)  In consideration of WRESTLER's grant of the rights, licenses and services hereunder, and provided WRESTLER faithfully and fully performs all of his obligations hereunder, PROMOTER shall pay WRESTLER at the rate of Five Hundred Thousand Dollars ($500,000.00) per annum.  It is expressly understood that this amount shall include compensation for all services and all merchandising activities involving WRESTLER and WRESTLER shall not be entitled to any additional compensation or revenues under this Agreement or the Merchandising Permission Agreement.

(b)  In the event WRESTLER is totally disabled to perform services hereunder due to an injury or illness in connection with the performance of services hereunder, as determined by a doctor selected by PROMOTER, PROMOTER shall pay WRESTLER at the rate of fifty percent (50%) of the compensation set forth above during the period of total disability for the lesser of the duration of such total disability or ninety (90) days.  If, after ninety (90) days, WRESTLER is unable to or does not resume the full range of services hereunder, PROMOTER shall not pay WRESTLER any portion of the compensation set forth above unless and until WRESTLER resumes the full range of services hereunder, in which case he shall be compensated pursuant to paragraph 6.1(a), or until he performs non-wrestling services, in which case the following sentence shall apply.  In the event WRESTLER is disabled to wrestle due to an injury or illness in connection with the

7-

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 40 of 162

performance of services hereunder, as determined by a doctor selected by PROMOTER, but performs non-wrestling services as requested by PROMOTER, PROMOTER shall pay WRESTLER at the rate of fifty percent (50%) of the compensation set forth in paragraph 6.1(a) during the period of partial disability for the lesser of the duration of such partial disability or the remainder of the term of this Agreement. PROMOTER shall have no other obligation, liability or responsibility to WRESTLER in connection with any injury, illness or disability resulting from the performance of services hereunder and WRESTLER releases PROMOTER from any claims which may arise in connection therewith. Whenever WRESTLER is unavailable to perform services hereunder due to any other reason, PROMOTER shall be entitled to reduce the compensation hereunder pro-rata for the time WRESTLER is unavailable to PROMOTER.

6.2 PROMOTER shall pay WRESTLER Nine Thousand Dollars ($9,000.00) per annum during the term of this Agreement to be applied by WRESTLER toward his purchase of an insurance policy insuring his income hereunder, such amount to be paid on or about the first day of each year of the term hereof.

6.3 In the event PROMOTER schedules Events for WRESTLER in Japan, WRESTLER may request PROMOTER to pay a bonus in connection with such services of WRESTLER, provided that the decision whether to pay any bonus and the amount thereof shall be at PROMOTER's reasonable discretion.

6.4 PROMOTER shall use its best efforts to schedule and provide WRESTLER seven (7) consecutive days of no services two (2) times per annum.

8

6.5 WRESTLER expressly agrees and acknowledges that in no event shall WRESTLER receive or be entitled to any share of any revenues derived by PROMOTER from any use or other exploitation of any of the Rights and/or the Intellectual Property in any wrestling magazine or other publication published by PROMOTER or any third party in conjunction with PROMOTER, from the sale or licensing in any medium, market or form of videocassettes of any of the Events or from any 800, 900 or 976 telephone call-in lines, or from Pay-Per-View Events.

6.6 WRESTLER acknowledges that he is an independent contractor of PROMOTER and shall be, as between PROMOTER and him, solely responsible and liable for the payment of any and all withholding, employment or other taxes levied, assessed or due as a result of the services which are performed by WRESTLER under this Agreement. PROMOTER shall have the right to withhold taxes from amounts payable to WRESTLER hereunder after any such assessment or if PROMOTER has reasonable grounds to believe that any such assessment will be forthcoming.

6.7 Because WRESTLER is an independent contractor of PROMOTER, PROMOTER shall not provide to WRESTLER any benefits, plans or programs whatsoever which are otherwise available to employees of PROMOTER.


## 7. PROMOTER'S OBLIGATIONS

7.1 During the term of this Agreement, PROMOTER shall bear the costs:

(a) Associated with PROMOTER's staging of Events before a live audience, including costs of location rental, sound and

9.

light equipment, wrestling ring, officials, police and fire protection and such additional security guards as PROMOTER shall require in its sole discretion, promotional assistance, facility charges and applicable state and local admission taxes; and

(b) Associated with the production, distribution and exploitation of the Events and the Programs.

7.2 (a) PROMOTER shall provide transportation to WRESTLER according to its customary travel policies for any Event located in Atlanta, Georgia or in excess of 300 miles from WRESTLER's designated base. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time and place of any such Event. In connection with a "tour" defined as more than two (2) Events within a consecutive three (3) day period, in which all Events are in Atlanta or more than 300 miles from WRESTLER's designated base, PROMOTER shall provide transportation to WRESTLER to return to his designated base during such tour if he has one (1) or more days off between consecutive dates on such tour. For purposes of this Agreement, WRESTLER's designated base is Charlotte, North Carolina.

(b) WRESTLER shall receive an upgrade to first (1st) class seating for all airline travel in connection with his services hereunder, provided that, to the extent WRESTLER earns frequent flyer points through such travel, these points shall be used first to upgrade WRESTLER's airline seating to first class and WRESTLER's frequent flyer points earned through such travel shall be used solely for upgrades and travel hereunder. WRESTLER will provide PROMOTER copies of statements reflecting frequent flyer

10.

points earned for travel in connection with his services
hereunder.

## 8. WRESTLER'S OBLIGATIONS

8.1 WRESTLER shall appear and perform services as
determined and directed by PROMOTER at a maximum of Two Hundred
thirty (230) Events per annum. WRESTLER shall appear at the
designated location for any such Event as directed by PROMOTER,
but not later than one hour before the designated time. WRESTLER
acknowledges that his failure to appear at least one hour before
the designated time or his failure to obtain or to have available
and maintain all necessary documents for travel on behalf of
PROMOTER (including but not limited to passports and visas),
shall subject him to a reasonable penalty, including any monetary
penalty, to be determined by PROMOTER in its sole discretion,
which shall be deducted from the consideration set forth in
Paragraph 6.1.

8.2 WRESTLER shall be responsible, at his sole expense, for
supplying all wardrobe, props and make-up necessary for the
performance of WRESTLER at any Event at which WRESTLER appears
and, for Events occurring no more than 300 miles from WRESTLER'S
designated base, except events in Atlanta, any costs incurred in
connection with his transportation to and from such Events, as
well as the costs of food consumed and hotel lodging utilized by
WRESTLER in connection with his appearance at any Events.
WRESTLER's wardrobe, props and make-up shall comply with
PROMOTER's company policy and be subject to PROMOTER's prior
approval.

11

8.3 WRESTLER agrees to appear at, cooperate with and assist in Events intended to publicize, advertise and promote wrestling engagements, matches and other Events, including without limitation press conferences, interviews and other publicity, promotional or exploitation appearances or activities, and at times and places designated by PROMOTER in PROMOTER'S sole discretion. The parties agree that any promotional on non-wrestling Event at which WRESTLER appears for less than (six) 6 hours shall not be counted as an Event for the purposes of Paragraph 8.1.

8.4 WRESTLER acknowledges the right of PROMOTER to make any changes in Events, Programs or any of WRESTLER'S services hereunder, and WRESTLER acknowledges and agrees that PROMOTER'S decision with respect thereto shall be final.

8.5 WRESTLER agrees to cooperate fully and in good faith with PROMOTER in the event PROMOTER deems it necessary to obtain life, disability or other insurance upon WRESTLER in such amount as PROMOTER may determine necessary. WRESTLER shall submit to physical or other examinations as may be required to obtain any such insurance and shall cooperate in the preparation and execution of applications and other documents as may be required in connection therewith.

8.6 WRESTLER agrees to be examined at PROMOTER'S request by any physician selected by PROMOTER and to execute such releases or to furnish information regarding WRESTLER'S physical and health condition requested by PROMOTER. In the event of any recovery by WRESTLER against a third party relating to any illness or injury which causes WRESTLER'S inability to provide

12.

services hereunder (except for recovery under an insurance policy purchased by WRESTLER), such recovery or portion thereof shall, at PROMOTER'S option, be paid to PROMOTER up to the amount necessary to reimburse PROMOTER to the extent of any payments made by PROMOTER hereunder during the period of WRESTLER'S disability; provided that nothing contained herein shall be deemed to obligate PROMOTER to make any such payments during the period of WRESTLER's disability.

8.7 WRESTLER shall indemnify PROMOTER and its parent, sibling and affiliated entities, licensees and assignees, and the officers, directors, employees, agents and representatives of the foregoing entities, and hold each of them fully harmless from any and all claims, demands, liabilities, actions, costs, suits, proceedings and expenses, whether fixed or contingent, including, without limitation, attorneys fees (including allocable costs of in-house counsel) and costs of action, incurred by any of the foregoing entities or individuals by reason of the breach or alleged breach of any warranty, undertaking, representation, agreement or certification made or entered into herein or hereunder by WRESTLER and/or by reason or arising out of or relating to WRESTLER'S conduct in association with services performed hereunder. WRESTLER agrees and understands that in the event that WRESTLER shall injure or cause bodily injury to any person outside of the ring, none of the foregoing entities or individuals shall in any event be held liable or otherwise responsible and WRESTLER specifically agrees to indemnify and hold harmless all of the foregoing entities and individuals therefrom.

13

8.8  WRESTLER represents, warrants and agrees that he is free to enter into this Agreement and to grant the rights herein granted to PROMOTER; he has not heretofore entered, and shall not hereafter enter, into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of any of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights granted to it herein; and there are no pending claims or litigation affecting WRESTLER which would or might interfere with the full and complete performance by WRESTLER of any of his obligations hereunder or the full and complete exercise or enjoyment by PROMOTER of any of the rights and licenses granted to it herein.

8.9  WRESTLER agrees that any use of illegal drugs or other substances proscribed by PROMOTER at any time during the term is prohibited under this Agreement.  WRESTLER further agrees that whenever requested by PROMOTER, WRESTLER shall submit to a medical examination and/or medical tests and agrees that any use of illegal drugs or other substances as demonstrated by such tests shall be grounds for monetary penalties imposed by PROMOTER, suspension without compensation or immediate termination of this Agreement without notice, as determined by PROMOTER.  In the event of such a termination, PROMOTER'S obligations pursuant to Paragraphs 6 and 11.1 hereof shall immediately cease, but all licenses and rights granted by WRESTLER to PROMOTER herein and under the Merchandising Permission Agreement shall continue as set forth in this Agreement.

14.

8.10  WRESTLER agrees to comply with all reasonable or customary requirements, directions, requests, policies, rules and regulations made by PROMOTER.  WRESTLER agrees to use his best efforts in the performance of services pursuant to this Agreement consistent with the customs of the professional wrestling industry and consistent with the directions and advice of PROMOTER'S match-maker, booker or other representative. WRESTLER'S failure to so perform shall entitle PROMOTER to impose monetary penalties upon WRESTLER in amounts determined by PROMOTER or suspend this Agreement and its obligations pursuant to Paragraphs 6 and 11.1 for a period to be determined solely by PROMOTER.  Alternatively, PROMOTER may immediately terminate this Agreement upon two (2) weeks written notice to WRESTLER.  Any such termination will fully release PROMOTER from all further obligations to WRESTLER, except for any consideration that has theretofore accrued pursuant to Paragraph 6 hereto, but all licenses and rights granted by WRESTLER to PROMOTER herein and under the Merchandising Permission Agreement shall continue as set forth in this Agreement.

## 9.  TERMINATION

9.1  This Agreement may be terminated for any material breach as set forth elsewhere herein.  Additionally, if WRESTLER fails to perform any of his duties or obligations hereunder or pursuant hereto in good faith, or otherwise breaches any material provision hereof or of the Merchandising Permission Agreement, PROMOTER may impose monetary penalties upon WRESTLER in amounts determined by PROMOTER or may suspend this Agreement and its

15.

obligations for a period to be determined solely by PROMOTER.
Alternatively, PROMOTER may in such a case immediately terminate
this Agreement upon two (2) weeks written notice to WRESTLER.
Any such termination will fully release PROMOTER from all further
obligations to WRESTLER, except for any consideration that has
theretofore accrued pursuant to Paragraph 6, but all licenses and
rights granted by WRESTLER to PROMOTER herein and under the
Merchandising Permission Agreement shall continue as set forth in
this Agreement.

9.2. This Agreement may be terminated by a written
instrument executed by the parties expressing their mutual
consent to so terminate without any further liability on the part
of either. In the event of such early termination, the earnings
guaranteed pursuant to Paragraph 6 and 11.1 of this Agreement
shall be prorated to the actual date of termination.

9.3 This Agreement shall terminate automatically in the
event of WRESTLER's death. In that event, PROMOTER shall be
released from all further obligations except for any
consideration that has theretofore accrued pursuant thereto, and
except for its obligation to pay merchandising royalties, which
shall continue in perpetuity. All licenses and rights granted to
PROMOTER herein shall continue as set forth in this Agreement.


## 10. BREACH

10.1 No failure by PROMOTER to perform any obligation
hereunder shall be deemed a breach hereof unless and until
WRESTLER shall have notified PROMOTER in writing of such alleged
breach and PROMOTER shall have failed to cure such alleged breach

16

within fifteen (15) days from receipt of such written notice. Only if PROMOTER fails to cure within such time period or if the breach is not curable, may WRESTLER seek to recover such damages as may be established in any court of law having jurisdiction of the parties and the subject matter.

10.2. In the event of WRESTLER'S breach, WRESTLER agrees to pay PROMOTER a royalty of sixty percent (60%) of all monies and all other consideration earned and derived by WRESTLER from the rendering of any wrestling or other licensed services, the merchandising of WRESTLER'S ring name and/or likeness or from the exercise of any other rights granted to PROMOTER under this Agreement for the remainder of what would have been the term hereof. WRESTLER hereby authorizes any person, firm or entity owing or paying WRESTLER for any of such services or for any of such merchandising activities or exercise of such rights in breach of this Agreement to pay such royalties directly to PROMOTER upon receipt of a copy of this Agreement, and to provide PROMOTER with any and all business records and documents concerning the sources, nature and amount of such revenues. For the remainder of what would have been the term hereof, WRESTLER shall not appear under or use in any manner whatsoever his ring name or any different name confusingly similar thereto, or otherwise use or exploit any of the Rights or the Intellectual Property.

10.3 The parties further agree, notwithstanding the royalty provided for above, that because of the special, unique and extraordinary nature of the services to be rendered by WRESTLER hereunder and of the rights and licenses which are the subject

17

matter of this Agreement, PROMOTER shall be entitled to injunctive and other equitable relief to prevent any breach or default by WRESTLER hereunder, and such relief shall be without prejudice to any other rights or remedies of PROMOTER as may be provided by law.

## 11. MISCELLANEOUS

11.1 Nothing herein shall be deemed to obligate PROMOTER to use WRESTLER's services in any Events or otherwise and PROMOTER shall have fully discharged its obligations to WRESTLER by providing the compensation specified in Paragraph 6.

11.2 This Agreement and the Merchandising Permission Agreement contain the entire understanding of the parties with respect to the subject matter hereof and, except as otherwise set forth herein, all prior understandings and negotiations will have been merged herein. There are no other agreements, representations or warranties, whether written, oral or otherwise, not set forth herein with respect to the subject matter hereof, and this Agreement may not be changed or altered except by an agreement in writing signed by both PROMOTER and WRESTLER. This Agreement and the Merchandising Permission Agreement supersede and cancel any prior agreement between the parties hereto concerning the subject matter hereof, with the exception of the provisions of the Memorandum of Agreement dated May 1, 1985, as amended, that relate to merchandising payments, and the Merchandising Permission Agreement dated December 20, 1990. Notwithstanding the foregoing, this Agreement shall not supersede or affect any agreement entered into between the

18

parties with respect to the use by Promoter or the use by a third party of the Intellectual Property.

11.3 A waiver by either party of any Paragraph, term or condition of this Agreement in any instance shall not be deemed or construed to be a waiver of such Paragraph, term or condition for the future or of any subsequent breach thereof, and any such waiver must be in writing. All rights and remedies contained in this Agreement are cumulative and none of them shall be construed so as to limit any other right or remedy of either party.

11.4 In the event any part or parts hereof are declared invalid or unenforceable, such part or parts shall be considered deleted and such declaration shall not affect the remaining provisions hereof.

11.5 PROMOTER shall have the right to assign, license or transfer this Agreement and/or any or all of the rights granted to it hereunder or any or all of its obligations provided herein to any entity or corporation and, if any such assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER thereafter shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate any of his rights or obligations hereunder.

11.6 Any notices required to be given hereunder shall be in writing and shall be delivered personally or sent postage prepaid by certified mail, return receipt requested, and addressed as follows or as the parties hereafter in writing otherwise may designate:

19

if to PROMOTER:

World Championship Wrestling, Inc.
One CNN Center
Box 105366
Atlanta, Georgia   30348-5366
Attention: Mr. Bill Watts

with a copy to:

Ginger S. McRae, Esq.
Assistant General Counsel
Turner Broadcasting System, Inc.
One CNN Center
Box 105366
Atlanta, Georgia   30348-5366

if to WRESTLER:

Richard M. Fliehr
2722 Plantation Road
Charlotte, NC   28270

with a copy to:

Thomas E. Beck
808 Raleigh Road
Glenview, Illinois   60025

The date of mailing or of personal delivery, as the case may be, shall be deemed to constitute the date of service of any such notice.

11.7  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia.  The parties hereto agree that the state or federal courts located in Atlanta, Georgia shall have personal jurisdiction over them with respect to, and shall be the exclusive forum for the resolution of, any matter of controversy or dispute arising from or with respect to this Agreement.  Service of a summons and complaint concerning any such matter of controversy or dispute may, in addition to any other lawful means, be effected by sending a copy of such summons

20

and complaint by certified mail to the party to be served as specified above or at such other address as the party to be served shall have provided in writing to the other party from time to time in accordance herewith.

11.8 All remedies set forth herein or otherwise available to either party hereunder shall be cumulative and no one remedy shall be exclusive of any other.

11.9 This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

"PROMOTER"
WORLD CHAMPIONSHIP WRESTLING, INC.

By: _____

Its: _____

"WRESTLER"

_____
RICHARD M. FLIEHR

\mcrae\agrees\wcw-fliehr.aa

## AMENDMENT

This amendment ("Amendment") has been entered into as of the 21st day of October, 1994 by and between WORLD CHAMPIONSHIP WRESTLING, INC. ("WCW") and RICHARD M. FLIEHR ("Fliehr") with reference to that certain Independent Contractor Agreement dated as of February 16, 1993 between WCW and Fliehr (the "Agreement").

In consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WCW and Fliehr agree to amend and modify the Agreement as follows:

1.  The defined term "WRESTLER" as set forth in paragraph 1 and appearing throughout the Agreement, shall be revised mutatis mutandis, to "WRESTLER/TALENT COORDINATOR".

2.  The following shall be inserted at the end of paragraph 1:

    (f)  To utilize the services of WRESTLER/TALENT COORDINATOR to provide wrestler and other talent coordination, booking and other such services.

3.  Paragraph 5.1 shall be amended to read as follows:

    The term of this Agreement shall be four (4) years, from February 16, 1993 through February 15, 1997, unless sooner terminated as hereinafter provided.

4.  The third sentence of paragraph 6.1 (b) is hereby deleted.

5.  The first sentence of paragraph 8.1 shall be amended to read as follows:

    WRESTLER/TALENT COORDINATOR shall appear and perform wrestling services as determined and directed by PROMOTER at a maximum of Two Hundred Thirty (230) Events per annum.

6.  The following shall be added to the end of paragraph 8.1:

    WRESTLER/TALENT COORDINATOR shall appear and perform talent coordinator/booking services as determined and directed by PROMOTER.

This Amendment to the Agreement shall only serve to amend and modify the Agreement to the extent specifically provided herein. All terms, conditions, provisions and references of and to the

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 55 of 162

Agreement which are not specifically modified and/or amended herein shall remain in full force and effect and shall not be affected by any provisions herein contained.

As hereby amended, the Agreement is ratified and reaffirmed in its entirety and shall remain in full force and effect. In the event of any conflict or inconsistency between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

RICHARD M. FLIEHR

WORLD CHAMPIONSHIP WRESTLING, INC.

By: _____

Title: _____

TOTAL P.04

## SECOND AMENDMENT

This second amendment ("Second Amendment") has been entered into as of the 24th day of May, 1996 by and between WORLD CHAMPIONSHIP WRESTLING, INC. ("WCW") and Richard M. Fliehr pka Ric Flair ("Wrestler") with reference to that certain Independent Contractor Agreement dated February 16, 1993 ("Agreement") and the subsequent Amendment dated October 21, 1994 between WCW and Wrestler ("Amendment").

In consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WCW and Wrestler agree to amend and modify Paragraph 5.1 of the Agreement and Paragraph 3 of the Amendment as follows:

> The term of this Agreement shall be five (5) years, from February 16, 1993 through February 15, 1998, unless sooner terminated as hereinafter provided.

This Second Amendment to the Agreement and the Amendment shall only serve to amend and modify the Agreement and the Amendment to the extent specifically provided herein. All terms, conditions, provisions and references of and to the Agreement and the Amendment which are not specifically modified and/or amended herein shall remain in full force and effect and shall not be affected by any provisions herein contained.

As hereby amended, the Agreement and the Amendment are ratified and reaffirmed in their entirety and shall remain in full force and effect. In the event of any conflict or inconsistency between the provisions of the Agreement and the Amendment and the provisions of this Second Amendment, the provisions of this Second Amendment shall control.

RICHARD M. FLIEHR

WORLD CHAMPIONSHIP WRESTLING, INC.

By:

Title:

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 57 of 162



A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366
(404) 827-2066    Fax: (404) 827-2931

FAX MAIL
(213) 782-4926

January 19, 1998

Mr. Michael Braverman
Mr. Barry Bloom
6399 Wilshire Blvd.
Suite 900
Los Angeles, CA 90048

Re: Richard M. Fliehr

Dear Michael and Barry:

Attached herewith, please find the draft copies of Ric's full Independent Contractor Agreement and Merchandising Agreement. Once you have had the opportunity to review the same, please call me with your comments and/or approval and I will prepare and forward execution copies.

Please feel free to give me a call at (404) 827-3433.

Sincerely,

Diana L. Myers
Legal Affairs

Enclosures

22 pages

# INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made and entered into as of the 16th day of February, 1998, by and between **WORLD CHAMPIONSHIP WRESTLING, INC.**, a Georgia corporation located at One CNN Center, Box 105366, Atlanta, Georgia 30348 ("WCW"), and the undersigned wrestler ("Wrestler").

FOR AND IN CONSIDERATION of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.  Services.

    (a)    Subject to the terms and conditions set forth in this Agreement, Wrestler agrees to provide the following services (the "Services") to WCW: i) appear and perform as a professional wrestler at events, including without limitation, live and taped television shows, pay-per-view telecasts, live arena shows, and any other promotional events, as requested by WCW ("Events"); ii) provide all wardrobe, props and make-up necessary for his performance at any Event; provided, however, all such items shall be subject to approval by WCW prior to their use in an Event; iii) cooperate with and assist in activities (not to be counted as Events) intended to publicize, advertise and promote Events, including, but not limited to, media interviews and other publicity appearances as requested by WCW; (iv) develop his own, individual wrestling style and persona, with advice from WCW, that will be attractive to wrestling fans; and (v) perform such other services as may be reasonably requested by WCW. Wrestler agrees to use his best efforts to perform the Services in a professional manner consistent with the customs of the professional wrestling industry.

(b)     In connection with Wrestler's performance of the Services, Wrestler grants

WCW the following exclusive, paid-up, worldwide rights: i) to arrange Wrestler's performance

or appearance at Events; ii) to sell or distribute admission tickets for all Events; iii) to create,

publish, distribute, broadcast, photograph, film, tape or otherwise record (or authorize others to

do so), in any and all available media, any or all of the Events or animated programs (any such

creation or recording shall be referred to as a "Program"); and iv) to use, exhibit and distribute,

and to license others to use, exhibit and distribute, in perpetuity, any Program, or any part or

segment of any Program, in any and all media and by any and all methods, whether now known

or coming into existence hereafter, and, in connection therewith, to utilize and exploit the name,

image, likeness, character, costume, props, ring name, voice, logo, service marks, trademarks,

trade names, signature, gimmicks, routines, themes and charicatures and any and all other

distinctive and identifying indicia as used by or associated with Wrestler. The rights granted by

this section shall be exclusive to WCW during the Term and for the period set forth in section

9(b), and shall be non-exclusive thereafter. Wrestler expressly acknowledges and agrees that the

rights granted to WCW in section 1(b)(iv) shall continue in effect after the expiration,

nonrenewal or termination (for any reason) of this Agreement.  WCW and Wrestler

acknowledge and agree that they have entered into that certain Merchandising Agreement of

even date herewith with respect to certain specified merchandising activities.

2.     **Independent Contractor.**  Wrestler, in the performance of the Services agreed to

in this document, is an independent contractor. In the performance of this Agreement, both

WCW and Wrestler shall be acting in their own separate capacities and not as agents, employees,

partners, joint venturers or associates of one another. It is expressly understood and agreed that

Wrestler is not authorized to bind WCW to any liability or obligation or to represent that it has

2.

any such authority. Wrestler is responsible for all of his expenses, including without limitation, medical expenses, health and welfare insurance, disability insurance, training expenses, props, wardrobe, make-up and other expenses necessary to perform the Services under this Agreement. Without limiting the generality of the foregoing, Wrestler acknowledges that, as between WCW and Wrestler, Wrestler shall be solely responsible and liable for the payment of any and all withholding or other taxes levied, assessed or due as a result of the services which are performed by Wrestler under this Agreement. Any and all travel incurred by Wrestler in the performance of services hereunder shall be pursuant to WCW's Travel Policy, as amended by WCW from time to time.

3.    **Compensation.**

(a)    As full and complete compensation for the Services, WCW shall pay to Wrestler, and Wrestler shall accept, the payments described on Exhibit A, attached hereto and incorporated herein by reference.

(b)    Wrestler's compensation as outlined in Exhibit "A" shall be apportioned according to the following schedule:

| | |
|---|---|
| Pay Per Views | 40% of annual compensation |
| Televised Events (taped or live) | 25% of annual compensation |
| Non-Televised House Shows | 20% of annual compensation |
| Interviews, Photo Shoots and Personal Appearances | 15% of annual compensation |

In the event Wrestler fails to timely appear and perform as required by WCW, except by reason of Incapacity, WCW shall have the right to deduct pro-rata sums from Wrestler's compensation payments based on the foregoing apportionment divided by WCW's reasonable projection of Wrestler's number of annual appearances in each category. In the event Wrestler is unable to

3

perform due to Incapacity as defined below, the terms of section (8) shall apply. This right of WCW shall be in addition to every other remedy now or later existing at law or in equity and shall not in any way interfere with any rights on the part of WCW to enjoin wrestler from any violation of this Agreement or any part thereof. Notwithstanding any reduction or deduction of compensation payments pursuant to this section, all remaining terms and conditions of this Agreement shall continue in full force and effect, unless and until terminated pursuant to the terms of this Agreement.

      (c)    Notwithstanding the forgoing apportionment, for general payment purposes, Wrestler's compensation shall be payable in equal installments on a bi-weekly basis or based on such schedule as WCW may implement from time to time.

    4.    **Ownership of Work Product.** All work product, themes, routines, characters, storylines, property, data, documentation or information or materials conceived, discovered, developed or created by Wrestler pursuant to this Agreement including, without limitation, the Programs (collectively, the "Work Product") shall be owned exclusively by WCW. To the greatest extent possible, any Work Product shall be deemed to be a "work made for hire" (as defined in the Copyright Act, 17 U.S.C.A. §§ 101 et seq., as amended) and owned exclusively by WCW. Wrestler hereby unconditionally and irrevocably transfers and assigns to WCW all right, title and interest in or to any Work Product, including, without limitation, all patents, copyrights, trade secrets, trademarks, service marks and other intellectual property rights therein. Wrestler has previously developed, and represents to WCW that he is the sole owner of the following ring name[s], stage name[s] or nickname[s] in connection with the provision of professional wrestling services "Ric Flair" and "The Nature Boy" ("Wrestler's Names"). Wrestler hereby licenses to WCW to use and exploit any and all of the Wrestler's Names exclusively during the Term for all

4

purposes hereunder, and non-exclusively thereafter in connection with WCW's exploitation or use of the Programs. Wrestler agrees that any ring name or nickname (other than Wrestler's Name) and any logo or character developed by him and/or WCW during the Term and used by him in connection with the performance of the Services shall be part of the "Work Product," and shall be the exclusive property of WCW. WCW shall have the right to register any such name, nickname or logo as a trademark or service mark of WCW, to the extent WCW considers such registration to be permitted and appropriate under any applicable law. Without regard to any such registration, Wrestler hereby covenants that he shall not use any such ring name, nickname, persona, logo or character developed during the Term for any purpose at any time, in perpetuity, without the express consent of WCW. Wrestler agrees to execute and deliver to WCW any transfers, assignments, documents or other instruments which WCW may deem necessary or appropriate, from time to time, to vest complete title and ownership of any Work Product, and all associated intellectual property and other rights, exclusively in WCW. If such Work Product is not considered to be a "work made for hire," Wrestler hereby assigns to WCW for One Dollar ($1.00) in hand and other good and valuable consideration all rights, title and interest in and to the copyright thereof and all renewals and extensions thereof that may be secured under the laws of any country now or hereafter in force and effect. WCW shall have full, immediate and unrestricted access to all Work Product during the Term of this Agreement.

5. **Compliance with Laws, Rules and Regulations.** (a) Wrestler agrees to comply with all applicable policies, rules, procedures and regulations adopted from time to time by WCW (including without limitation the WCW Independent Contractor Rules and Regulations and Travel Policy) and all other applicable federal, state and local laws, rules, regulations, or

5

ordinances; (b) Wrestler further agrees to abide by the terms and conditions of the WCW

Substance Abuse Policy which Wrestler agrees he has received and reviewed.

6.      **Representations and Warranties.**  Wrestler hereby represents and warrants to

WCW as follows: (a) Wrestler is the sole owner of the names "Ric Flair" and "The Nature Boy"

and the characters associated therewith and Wrestler hereby grants WCW the right to utilize such

to effectuate the provisions of this Agreement; (b) Wrestler has the full power, authority, ability

and legal right to execute and deliver this Agreement and to perform his obligations hereunder;

(c) Wrestler has all legal rights, power, authority and ability to convey the Work Product to

WCW; (d) this Agreement constitutes the legal, valid and fully binding obligation of Wrestler

and is enforceable in accordance with its terms; (e) the execution, delivery and performance of

this Agreement have been consented to and authorized by all individuals or entities required to

consent to and authorize the same, will not contravene any law, regulation, judgment or decree

applicable to Wrestler, and will not cause or result in a breach of or default under any other

agreement, contract or understanding to which Wrestler is a party; (f) there are no pending

claims or litigation which would or might interfere with the performance of Wrestler's

obligations or the enjoyment of WCW's rights under this Agreement; and (g) Wrestler is not

currently using, and during the term of this Agreement, shall not use, any illegal drugs, steroids

or other substances prohibited by WCW.

7.      **Indemnification.**  Wrestler agrees to indemnify, defend and hold harmless

WCW, its directors, officers, and shareholders, and their respective agents, officers and

employees, against any and all suits, damages, expenses (including, without limitation, court

costs, attorneys' fees and allocable costs of in-house counsel), losses, liabilities and claims of any

kind, caused by or resulting from any breach of this Agreement or by any other act or omission

6

·of Wrestler whether the same may be the result of negligence, willful act, responsibility under strict liability standards, any other substandard conduct or otherwise.

Wrestler shall at all times be responsible for any loss or damage to any WCW property by Wrestler or while in the possession of Wrestler, unless said damage occurs at the direct instruction of WCW as part of a storyline. The loss or damage thereto shall be restored at Wrestler's expense.

8. **Term, Termination and Incapacity.**

(a)    Unless sooner terminated in accordance with the provisions of this Agreement, the term of this Agreement shall be as described in Exhibit A attached hereto and incorporated herein by reference.

(b)    Wrestler may terminate this Agreement upon the occurrence of any material breach of any provision hereof by WCW which remains uncured for a period of fifteen (15) consecutive days.

(c)    WCW may immediately terminate this Agreement upon the occurrence or at any time during the continuation of any material breach of any provision hereof by Wrestler.

(d)    This Agreement shall terminate automatically upon the death of Wrestler.

(e)    The following shall govern in the event of incapacity of Wrestler for any reason:

(i) For the purposes of this Agreement, "Incapacity" shall be defined as Wrestler's inability to perform all of the physical requirements of the Services, as determined by WCW. WCW may, at its option and expense, require Wrestler to be evaluated by a physician selected by WCW for purposes of determination of Incapacity.

(ii) In the event of Incapacity, Wrestler shall continue to receive his full compensation payments for the first thirty (30) days of Incapacity per contract year and the Agreement shall remain in full force.

7

(iii) If, Wrestler remains incapacitated after the initial thirty (30) day Incapacity period, WCW shall have the option, at any point during which Wrestler thereafter remains incapacitated, to terminate this Agreement, without further obligation.

(iv) Unless and until WCW shall exercise such right to terminate this Agreement on the basis of Incapacity, WCW shall (a) continue to pay Wrestler under this Agreement at the rate of 1/3 (33.3%) of the compensation otherwise payable hereunder; or (b) utilize Wrestler for non-wrestling Services and pay Wrestler at the rate of 1/2 (50%) of the compensation otherwise payable hereunder. Wrestler's ability to perform non-wrestling Services shall be determined by WCW. While Wrestler is being paid pursuant to (iv)(a) or (b), all other terms of this Agreement shall remain in full force.

(v) Any reduction in compensation pursuant to this section shall cease upon the earlier of (a) a determination that Wrestler is again able to perform all the physical requirements of the Services; (b) the expiration of this Agreement; or (c) the termination of this Agreement by WCW, as provided for herein.

(g) Wrestler acknowledges his present eligibility for workers' compensation through WCW. Wrestler agrees to accept the benefits provided by said workers' compensation coverage as his sole and exclusive remedy against WCW, (including its parent, affiliates, employees and agents), for any and all injuries sustained during the Term provided said coverage is maintained by WCW and is in effect with respect to such injury. Notwithstanding anything herein to the contrary, WCW shall not be obligated to maintain workers' compensation coverage.

9. **Restrictive Covenants**.

(a) Confidentiality. "Confidential Information" shall mean any confidential, proprietary, business information or data belonging to or pertaining to WCW that does not constitute a "Trade Secret" (as defined under applicable law) and that is not generally known by or available through legal means to the public. In recognition of WCW's need to protect its legitimate business interests, Wrestler hereby covenants and agrees that Wrestler shall not, unless specifically directed by WCW, for any reason or in any fashion, either directly or indirectly use, disclose, transfer, assign, disseminate, reproduce, copy, or otherwise communicate any:

8

Confidential Information, at all times during his contractual relationship with WCW and for a period of one (1) year following the termination thereof for any reason; and Trade Secrets, at all times such information remains a "trade secret" under applicable law. During the Term, Wrestler shall: exercise his best efforts to ensure the continued confidentiality of all Trade Secrets and Confidential Information of WCW known by, disclosed to or made available to Wrestler; whether in connection with this Agreement or any other past or present relationship with WCW; immediately notify WCW of any unauthorized disclosure or use of any Trade Secrets or Confidential Information of which Wrestler becomes aware; and assist WCW, to the extent necessary, in the procurement of or any protection of WCW's rights to or in any of the Trade Secrets or Confidential Information.

(b) Noncompetition. During the term of this Agreement, Wrestler shall perform the Services exclusively for WCW and shall not, directly or indirectly, be employed by, or perform the Services for, or engage or be connected in any manner with any other individual, entity or business. Notwithstanding the foregoing, it is acknowledged that Wrestler has an ownership interest in Ric Flair's Gold's Gym in Charlotte, North Carolina and has plans to do promotional work for Gold's Gym and to open other gyms and shall be entitled to use and authorize the use of his name, ring name, likeness and voice in connection with the operation and promotion of such businesses and the sale of merchandise in connection therewith. Wrestler expressly covenants and agrees that for a period of ninety (90) days after any termination or expiration of this Agreement for any reason, he shall not directly or indirectly, be employed by, perform the Services for, or engage or be connected in any manner with any other individual, entity or business of the type and character engaged in and competitive with that conducted by

9

WCW, without advance written approval from the Senior Vice President of WCW. In addition, Talent will not perform any of the Services in the United States, Canada, Japan or Mexico.

(c)     Acknowledgment of Reasonableness. The parties expressly acknowledge the reasonableness and content of the covenants and agreements contained in this section.

10.     **Notices.** All notices and statements provided for or required by this Agreement shall be in writing, and shall be delivered personally to the other designated party, or mailed by certified or registered mail, return receipt requested, or delivered by a recognized national overnight courier service, to the addresses set forth together with the signature of each party to this Agreement.

11.     **Miscellaneous.**

(a)     This Agreement, and the documents referenced herein, contain the entire agreement and understanding and shall supersede all prior agreements or understandings concerning the subject matter hereof between the parties hereto. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party hereto unless confirmed in writing. This Agreement may not be modified or amended, except by a writing executed by both parties. No waiver by either party of any term or provision of this Agreement or of any default hereunder shall affect such party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)     This Agreement is the product of arm's-length negotiations between Wrestler and WCW. Wrestler expressly states that he has had the opportunity to seek and obtain consultation in connection with the negotiation and execution of this Agreement, and that he fully understands the rights and obligations set forth herein. In the construction and

10

interpretation of this Agreement, no account shall be taken of which party requested or drafted any particular provision or provisions of this Agreement.

(c)     Regardless of the place of execution hereof, this Agreement and all amendments hereto, shall be deemed to have been negotiated, made, entered into and fully performed in the State of Georgia, without regard to the actual location at which Wrestler provides Services to WCW. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Georgia applicable to contracts made, entered into and performed entirely therein, without giving effect to its conflict of laws provisions. Wrestler hereby (i) submits to the jurisdiction of the United States District Court for the Northern District of Georgia and of any Georgia state court sitting in Atlanta for the purposes of all legal proceedings arising out of or relating to this Agreement and (ii) irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any such proceeding which is brought in such a court. Additionally, the parties hereto agree that the State of Georgia shall be the exclusive forum and situs for the resolution of any and all disputes, controversies or matters arising herefrom or related hereto. Wrestler's Home Base is identified solely for travel purposes and shall not affect the choice of law, jurisdiction or venue hereunder.

(d)     The parties further agree, notwithstanding the consideration provided for herein, that because of the special, unique and extraordinary nature of the Services hereunder and of the rights and licenses which are the subject matter of this Agreement, WCW shall be entitled to injunctive and other equitable relief to prevent any breach or default by Wrestler hereunder, and such relief shall be without prejudice to any other rights or remedies of WCW as may be provided by law.

(e)     WCW may hereby assign its rights and delegate its obligations under this Agreement, and if such assignee shall assume WCW's obligations in writing, WCW shall have

11

no further obligations to Wrestler. Wrestler may not assign this Agreement, in whole or in part, without the prior written consent of WCW, and any attempted assignment not in accordance herewith shall be null and void and of no force or effect.

(f)     This Agreement shall be binding on Wrestler and his successors and permitted assigns.

(g)     Nothing herein shall be deemed to obligate WCW to use the services of Wrestler and WCW shall have fully discharged its obligations hereunder by paying the amount specified herein.

(h)     With respect to WCW's rights hereunder, WCW shall have the sole right and discretion to bring any and all claims including but not limited to infringement or unfair competition claims.

(i)     The headings contained herein are for the convenience of the parties only and shall not be interpreted to limit or affect in any way the meaning of the language contained in this Agreement.

(j)     This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party.

(k)     If any provision of this Agreement shall be held void, voidable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein.

(l)     Upon the request of WCW, Wrestler agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the terms and conditions set forth in this Agreement.

12.

(m)     Notwithstanding any termination of this Agreement, all provisions which, by their terms or reasonable interpretation thereof, sets forth obligations that extend beyond the termination of this Agreement hereof shall survive and remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed or caused their duly authorized representatives to execute this Agreement to be effective as of the day and year first above written.

"WRESTLER"                              "WCW"

Signature:_____         By:_____

Printed Name:_____      Title:_____

13

# INDEPENDENT CONTRACTOR AGREEMENT

## FOR: RICHARD M. FLIEHR

## EXHIBIT "A"

**COMPENSATION:** In consideration of Wrestler's grant of the rights, licenses and services hereunder, and provided Wrestler faithfully and fully performs all of his obligations hereunder, WCW shall pay Wrestler according to the following schedule:

| | | |
|---|---|---|
| Year 1 | February 16, 1998 through February 15, 1999 | $725,000.00 |
| Year 2 | February 16, 1999 through February 15, 2000 | 725,000.00 |
| Year 3 | February 16, 2000 through February 15, 2001 | 500,000.00 |

The Year 3 compensation set forth above, shall represent your compensation for the first one hundred and thirty (130) days (exclusive of travel) which you are required to perform the Services hereunder during Year 3. In the event, the number of days Wrestler is required to perform the Services hereunder in Year 3 exceeds one hundred and thirty (130), Wrestler shall be compensated at the rate of Three Thousand Seven Hundred and Fifty Dollars ($3,750.00) per each additional day over and above one hundred thirty (130) days, exclusive of travel.

**TERM:** This Agreement shall commence as of February 16, 1998 and shall continue until February 15, 2001.

**TRAVEL:** When required to travel for WCW pursuant to this Agreement, WCW will (at is expense) provide Wrestler with hotel accommodations and first class air transportation. In addition, Wrestler shall be credited $500.00 per appearance date worked (exclusive of travel) for limousine transportation. The limousine transportation credit shall be included in the bi-weekly compensation payments.

14

**SPECIAL PROVISIONS:** The number of dates per year which Wrestler shall be required to appear shall be limited as follows:

Year 1: Maximum number of days: 220 (exclusive of travel)

Year 2: Maximum number of days: 210 (exclusive of travel)

Year 3: Maximum number of days: 200 (exclusive of travel)

**HOME BASE:** Charlotte, North Carolina

**ADDRESS:** 2722 Plantation Road, Matthews, NC 28270

**SOCIAL SECURITY NUMBER:** 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

_____          _____
WRESTLER                           WORLD CHAMPIONSHIP WRESTLING, INC.

15.

# WORLD CHAMPIONSHIP WRESTLING, INC.

## MERCHANDISING AGREEMENT

THIS MERCHANDISING AGREEMENT (the "Agreement") is made as of the 16th day

of February, 1998, by and between **WORLD CHAMPIONSHIP WRESTLING, INC.**, a Georgia

corporation ("WCW"), whose address is One CNN Center, Box 105366, Atlanta, Georgia 30348

and **Richard M. Fliehr** whose address is 2722 Plantation Road, Matthews, NC 28270

("Wrestler").

### RECITALS:

A.  WCW and Wrestler have entered into that certain Independent Contractor Agreement of even date herewith (the "Independent Contractor Agreement") pursuant to which Wrestler has agreed to perform certain services for WCW.

B.  The Independent Contractor Agreement contemplates and requires that WCW and Wrestler enter into this Agreement.

For and in consideration of the above premises and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

### 1.  GRANT OF RIGHTS

(a)  Wrestler grants WCW the exclusive (including to the exclusion of Wrestler), worldwide right and license, subject to Paragraph 6 below, to use and to license third parties to use, Wrestler's name, ring name, image, likeness, voice, logo, service marks, trademarks, trade names, signature, costumes, props, gimmicks, routines, themes, characters and caricatures and any and all of Wrestler's other distinctive and identifying indicia as used by or associated with Wrestler in the business of professional wrestling (all of the foregoing are collectively referred to as the "Intellectual Property"), in connection with the design, manufacture, printing, production, reproduction, publishing, sale, distribution and advertising of any materials, goods and/or services, and all other commercial exploitation of the Intellectual Property of any kind or nature and in any and all forms and media now known or hereafter devised, to be determined in WCW's sole

discretion, (collectively the "Merchandise") whereby such activities are conducted (i) directly by WCW, its affiliated companies, and/or through its distribution agent (the "Merchandising Activities") and/or (ii) by a third party under a license from WCW (the "Licensing Activities"); (the activities in (i) and (ii) above are collectively referred to as the "L&M Activities"). By way of example and not of limitation, Merchandise which may be produced, sold and/or distributed by WCW or its affiliated companies or its licensees pursuant to this Agreement, shall include clothing, sports equipment, posters, pens, keychains, toys, cards, photographs, televisions rights, videotapes and videocassettes, dolls, books, games, biographies, comic books, articles and stories, and any other similar or dissimilar item, product or service as WCW may determine in its sole discretion from time to time.

(b) WCW shall own all rights in and to any and all Merchandise, including but not limited to copyrights, trademarks, service marks and other proprietary rights therein, and shall be entitled to obtain federal and state registrations thereof in its own name. Wrestler agrees to provide all reasonable assistance to WCW in obtaining any such registration.

2. **PROTECTION OF INTELLECTUAL PROPERTY.**

(a) Quality Control. Wrestler agrees that WCW's current merchandise Program is adequate and suited to the best exploitation and enhancement of the Intellectual Property and the goodwill pertaining thereto. WCW agrees to maintain this standard of quality throughout the term of this Agreement and to provide Wrestler, upon Wrestler's written request, one (1) sample of each article of merchandise created pursuant to this agreement for purposes of quality control.

(b) Infringement Protection. Wrestler shall notify WCW in writing of any infringement or imitation of the Intellectual Property or the Merchandise which comes to Wrestler's attention. WCW shall have the sole and exclusive right, at WCW's expense, to take all reasonable steps to stop any infringement or imitation of the Intellectual Property or the Merchandise, including, without limitation, the right to commence and prosecute any claims suits, actions, or proceedings in its own or Wrestler's name and to collect and retain any monetary award therefrom; provided, however, in the event WCW elects not to pursue any such claims or actions, Wrestler shall be entitled to bring any such aim or actions with WCW's prior written consent.

3. **CONSENT.** Unless otherwise expressly provided in this agreement, Wrestler expressly acknowledges and agrees that his/her approval shall not be required for WCW to enter into any agreement which authorizes the exploitation, anywhere in the world, of any or all of the Intellectual Property. Wrestler agrees to execute any agreements or documents WCW deems necessary in connection with any such agreements, and if Wrestler is unavailable or refuses to execute such agreements, WCW is hereby authorized to do so in Wrestler's name and Wrestler's attorney-in-fact.

4. **EXCLUSIVITY.** The rights and licenses granted to WCW by Wrestler in Paragraph 1 above are exclusive to WCW, even to the exclusion of Wrestler, during the term of this Agreement. The expiration, nonrenewal or termination of this Agreement shall in no way limit,

invalidate or otherwise affect the exclusivity of any rights granted to any third party in accordance with this Agreement, even if the term of any such agreement continues beyond the date of expiration, nonrenewal or termination of this Agreement.

     5.    **TERM**.

        (a)  The term of this Agreement shall commence on the date hereof, and shall be coterminous with the Independent Contractor Agreement.

        (b)  Notwithstanding anything herein to the contrary, the expiration, nonrenewal or termination of this Agreement shall not affect any agreement concerning any or all of the Intellectual Property, including, but not limited to, any agreements entered into during the term and in accordance with this Agreement granting a third party the right to use the Intellectual Property, even if the term of such agreement with such third party continues beyond the date of the expiration, nonrenewal or termination of this Agreement.

        (c)  Notwithstanding anything herein to the contrary, the expiration, nonrenewal or termination of any agreement between Wrestler and WCW (other than this Agreement and the Independent Contractor Agreement) shall not affect the term of this Agreement or any agreement concerning any or all of the rights in the Intellectual Property, including but not limited to, any agreements entered into during the term and in accordance with this Agreement granting a third party the right to use the Intellectual Property.

     6.    **CONSIDERATION**.

        (a)  Subject to Section 6(c) of this Agreement, in consideration of the rights granted to WCW hereunder, WCW shall pay Wrestler five percent (5%) of all revenues actually received by WCW or any of its affiliated companies specifically derived from the use of the Intellectual Property in connection with Merchandising Activities, less any cost of goods sold, sales tax and vendor commissions (the "Merchandising Royalties"). With respect to any Merchandising Royalties derived from the use of the Intellectual Property together with the name, image, likeness or other proprietary indicia of one or more other wrestler or other persons, five percent (5%) of such Merchandising Royalties shall be placed into a pool (a "Merchandising Royalty Pool") and Wrestler shall receive a portion of such Merchandising Royalty Pool equal to the ratio of one (1) to the total number of wrestlers or other such persons whose names, images, likenesses or other proprietary indicia are used in connection with such Merchandising Activity. By way of example, but not of limitation, if any of Wrestler's Intellectual Property is used in any Merchandising Activity together with that of one other wrestler, Wrestler shall receive one-half (1/2) of the Merchandising Royalty Pool; if it is used with that of two other wrestlers, Wrestler shall receive one-third (1/3) of the Merchandising Royalty Pool.

        (b)  Subject to Section 6(c) of this Agreement, in consideration of the rights granted to WCW hereunder, WCW shall pay Wrestler thirty-three and one-third percent (33 1/3%) of all revenues actually received by WCW or any of its affiliated companies specifically derived

·from the use of the Intellectual Property in connection with Licensing Activities (the "Licensing Royalties"). With respect to any Licensing Royalties derived from the use of the Intellectual Property together with the name, image, likeness or other proprietary indicia of one or more other wrestler or other persons, thirty-three and one-third percent (33 1/3%) of such Licensing Royalties shall be placed into a pool (a "Licensing Royalty Pool") and Wrestler shall receive a portion of such Licensing Royalty Pool equal to the ratio of one (1) to the total number of wrestlers or other such persons whose names, images, likenesses or other proprietary indicia are used in connection with such Licensing Activity. By way of example, but not of limitation, if any of Wrestler's Intellectual Property is used in any Licensing Activity together with that of one other wrestler, Wrestler shall receive one-half (1/2) of the Licensing Royalty Pool; if it is used with that of two other wrestlers, Wrestler shall receive one-third (1/3) of the Licensing Royalty Pool.

(c) Notwithstanding anything herein to the contrary, Wrestler expressly acknowledges and agrees that in no event shall Wrestler receive or be entitled to any share of any revenues derived by WCW from the sale or other exploitation of any of the Intellectual Property in connection with (i) any wrestling magazine published and distributed by WCW (or its licensees), or (ii) the sale or licensing in any medium, market or form of videocassettes of any wrestling matches or other events sponsored by WCW, or (iii) any telephone call-in lines (such as 800, 900, 511, or 976), or (iv) any pay-per-view wrestling matches or events.

7. **REPRESENTATIONS AND WARRANTIES**. Wrestler represents, warrants and agrees that:

(a) He/she is free to enter into this Agreement and to grant the rights and licenses herein granted to WCW (collectively, the "Granted Rights") and that WCW's use of the Intellectual Property in accordance with this Agreement will not violate or infringe upon any right of any third party;

(b) He/she has not previously entered and shall not hereafter enter into any contract, agreement or arrangement that is in conflict with the provisions hereof or that would interfere with the full and complete performance by Wrestler of any of his/her obligations hereunder or the free and unimpaired exercise or enjoyment by WCW of any of the Granted Rights; and

(c) There are no pending claims or litigation affecting Wrestler or any of the Intellectual Property which would or might interfere with the full and complete performance by Wrestler of any of his/her obligations hereunder or the full and complete exercise or enjoyment of WCW of any of the Granted Rights.

8. **INDEMNIFICATION**.

(a) Each party (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party (the "Indemnitee") from and against all costs, damages, claims (threatened or actual) and expenses (including, without limitation, reasonable attorney's fees and allocable fees

from the use of the Intellectual Property in connection with Licensing Activities (the "Licensing Royalties"). With respect to any Licensing Royalties derived from the use of the Intellectual Property together with the name, image, likeness or other proprietary indicia of one or more other wrestler or other persons, thirty-three and one-third percent (33 1/3%) of such Licensing Royalties shall be placed into a pool (a "Licensing Royalty Pool") and Wrestler shall receive a portion of such Licensing Royalty Pool equal to the ratio of one (1) to the total number of wrestlers or other such persons whose names, images, likenesses or other proprietary indicia are used in connection with such Licensing Activity. By way of example, but not of limitation, if any of Wrestler's Intellectual Property is used in any Licensing Activity together with that of one other wrestler, Wrestler shall receive one-half (1/2) of the Licensing Royalty Pool; if it is used with that of two other wrestlers, Wrestler shall receive one-third (1/3) of the Licensing Royalty Pool.

(c)    Notwithstanding anything herein to the contrary, Wrestler expressly acknowledges and agrees that in no event shall Wrestler receive or be entitled to any share of any revenues derived by WCW from the sale or other exploitation of any of the Intellectual Property in connection with (i) any wrestling magazine published and distributed by WCW (or its licensees), or (ii) the sale or licensing in any medium, market or form of videocassettes of any wrestling matches or other events sponsored by WCW, or (iii) any telephone call-in lines (such as 800, 900, 511, or 976), or (iv) any pay-per-view wrestling matches or events.

7.    **REPRESENTATIONS AND WARRANTIES**.  Wrestler represents, warrants and agrees that:

(a)    He/she is free to enter into this Agreement and to grant the rights and licenses herein granted to WCW (collectively, the "Granted Rights") and that WCW's use of the Intellectual Property in accordance with this Agreement will not violate or infringe upon any right of any third party;

(b)    He/she has not previously entered and shall not hereafter enter into any contract, agreement or arrangement that is in conflict with the provisions hereof or that would interfere with the full and complete performance by Wrestler of any of his/her obligations hereunder or the free and unimpaired exercise or enjoyment by WCW of any of the Granted Rights; and

(c)    There are no pending claims or litigation affecting Wrestler or any of the Intellectual Property which would or might interfere with the full and complete performance by Wrestler of any of his/her obligations hereunder or the full and complete exercise or enjoyment of WCW of any of the Granted Rights.

8.    **INDEMNIFICATION**.

(a)    Each party (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party (the "Indemnitee") from and against all costs, damages, claims (threatened or actual) and expenses (including, without limitation, reasonable attorney's fees and allocable fees

of in-house counsel) which may arise or derive in any way from the Indemnifying Party's breach of any of its duties, obligations, representations or warranties under this Agreement. The Indemnitee shall give the Indemnifying Party prompt written notice of any such claim or suit, and the indemnifying Party shall have the right to control the defense thereof; provided, however, that without the consent of the Indemnitee, the Indemnifying Party shall not agree to any settlement of such claim or suit which would have more that a de minimus effect on the Indemnitee's business.

(b) For purposes of this paragraph, "Indemnitee" shall include, with respect to WCW, the respective officers, directors and employees of WCW and its parent, subsidiaries and affiliates.

9. **ACCOUNTING AND STATEMENTS**.

(a) On or before the date forty-five (45) days after the end of each calendar quarter during which WCW is receiving Merchandising and/or Licensing Royalties hereunder, WCW shall send Wrestler statements showing gross Merchandising and/or Licensing Royalties actually received by Wrestler during such quarter. Payments due to Wrestler hereunder shall accompany such statements.

(b) WCW shall maintain at its main office, records covering all transactions relating to amounts payable under this Agreement. WCW shall keep such records for at least two (2) years following WCW's receipt thereof, and such records shall be available for inspection by Wrestler or his/her designated representatives, once per year, and only once with respect to any particular records, during reasonable business hours and upon reasonable notice. In the event any inconsistencies or mistakes are discovered in such statements or payments, such inconsistencies shall be promptly rectified and the appropriate payments made by WCW.

10. **COOPERATION**. Wrestler acknowledges that WCW's exploitation of the Granted Rights may require Wrestler's further cooperation, including but not limited to Wrestler's attendance at and participation in photo shoots, tapings, promotions advertising and other events and appointments. Accordingly, Wrestler agrees to give WCW, upon WCW's reasonable request and at WCW's expense, Wrestler's full reasonable cooperation with respect to such activities.

11. **MISCELLANEOUS**.

(a) Nothing herein shall be deemed to obligate WCW to use the Intellectual Property in connection with any L&M Activities or otherwise. This Agreement shall not be construed in any way to limit WCW's ability to enter into this type of arrangement with any other individual or entity.

(b) This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and may not be changed or altered except by an agreement in writing signed by both parties.

(c) WCW shall have the right to assign, license or transfer this Agreement and/or any or all of the rights granted to it hereunder or any or all of its obligations provided herein to any entity or corporation and, if any such assignee shall assume in writing WCW's obligation hereunder, WCW thereafter shall have no further obligations to Wrestler. Wrestler may not assign, transfer or delegate any of his/her rights or obligations hereunder.

(d) Any notices to be given to a party hereunder shall be in writing and shall be delivered personally or sent postage prepaid by certified mail, return receipt requested to such party's respective address as first set forth above, or as such party may otherwise designate in accordance herewith. The date of mailing or of personal delivery, as the case may be, shall be deemed to constitute the date of service of any such notice.

(e) This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia. The parties hereto agree that the state or federal courts located in Atlanta, Georgia shall have personal jurisdiction over them with respect to, and shall be the exclusive forum for the resolution of, any matter of controversy or dispute arising from or with respect to this Agreement. Service of a summons and complaint concerning and any such matter of controversy or dispute may, in addition to any other lawful means, be effected by sending a copy of such summons and complaint by certified mail to the party to be served as specified above or at such other address as the party to be served shall have provided in writing to the other party from time to time in accordance herewith.

(f) This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year first above written.


"WRESTLER"                                    "WCW"



Signature:_____          By: _____

Printed Name:_____           Title:_____

# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

WORLD CHAMPIONSHIP WRESTLING, INC.,

**PLAINTIFF**

CIVIL ACTION,
NUMBER _E.67920_

VS.

RICHARD M. FLIEHR, a/k/a RIC FLAIR,

**DEFENDANT**

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

James A. Lamberth & David C. Vigilante
TROUTMAN SANDERS LLP
Suite 5200, NationsBank Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216

an answer to the complaint which is herewith served upon you, within 30 days after the service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____17th_____ day of _____April_____, 19 _98_.

Juanita Hicks
Clerk of Superior Court

By _____
Deputy Clerk

To Defendant upon whom this petition is served:

This copy of complaint and Summons was served upon you _____ 19_____ .

_____ Deputy Sheriff

**Instructions:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 82 of 162   6009-082-685

GEORGIA, FULTON COUNTY
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE COMPLETE AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS BY THE ORIGINAL ON FILE IN THE OFFICE OF CLERK OF FULTON SUPERIOR COURT, CONSISTING OF 62 PAGES.
WITNESS MY HAND AND THE SEAL OF SAID COURT THIS THE 4th DAY OF August 1998

DEPUTY CLERK, FULTON SUPERIOR COURT

JUANITA HICKS
CLERK OF THE SUPERIOR COURT
OF FULTON COUNTY, GEORGIA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

WORLD CHAMPIONSHIP WRESTLING, )
INC., )
         )
     Plaintiff, )   CIVIL ACTION FILE
         )
         )   NO. E-67920
v.        )
         )
RICHARD M. FLIEHR a/k/a RIC FLAIR, )
         )
     Defendant. )

## AMENDED COMPLAINT

World Championship Wrestling, Inc. ("WCW") files its Amended Complaint against
Richard M. Fliehr a/k/a/ Ric Flair as follows:

1.

WCW is a corporation existing under the laws of the State of Georgia. WCW is in the
business of arranging and promoting professional wrestling events.

2.

Defendant Flair is a resident of the State of North Carolina and may be served at his
address of 2722 Plantation Road, Matthews, North Carolina 28270. Flair is subject to the
jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91 and by virtue of his voluntary
submission to the jurisdiction of this Court.

3.

Venue is proper in this Court.

0250892.02

4.

WCW organizes and promotes professional wrestling events worldwide. WCW presents monthly pay-per-view wrestling shows that are telecast throughout the United States. In addition to its pay-per-view programming, WCW presents three cable television programs featuring professional wrestling: "Monday Nitro," which airs live on Monday nights; "Thunder" which airs live on Thursday nights and "WCW Saturday Night," which airs on Saturday nights. WCW also has two television shows, "WCW Worldwide" and "WCW Pro" which are in syndication on 186 different stations nationwide. WCW also sells home videos of its pay-per-view events and presents, throughout the United States, and in Europe and Asia, "in-house" non-televised professional wrestling events.

5.

Flair is a professional wrestler. With the exception of one year, Flair has wrestled for WCW since 1988. During part of this period, Flair also was a member of and, for a time, the head of WCW's booking committee. As a member of and as head of WCW's booking committee, Flair was involved in the development of story lines involving various WCW wrestlers. These story lines are developed in advance and require the cooperation of all wrestlers involved in order to be properly executed.

6.

On or about November 11, 1997, Flair entered into a binding letter agreement with WCW (hereinafter "the Letter Agreement"). The Letter Agreement set forth the principal terms of a new independent contractor agreement between WCW and Flair pursuant to which Flair would continue to provide wrestling services to WCW through February 15, 2001. A true and correct

2

copy of the Letter Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

7.

At the time Flair executed the Letter Agreement, Flair was currently engaged as an independent contractor by WCW through and including February 15, 1998 pursuant to an Independent Contractor Agreement dated February 16, 1993, as amended. A true and correct copy of this Independent Contractor Agreement and its amendments are attached hereto as Exhibit "B" and incorporated herein by reference.

8.

The Letter Agreement expressly stated that it would be binding pending the execution of a formal Independent Contractor Agreement, a draft of which was forwarded to Flair's agents on or about January 19, 1998.

9.

Pursuant to the Letter Agreement, Flair agreed that he would provide wrestling and wrestling related services as required by WCW. Flair further agreed that he would wrestle exclusively for WCW and that he would not provide services to any third party or organization during the term of the Agreement.

10.

Pursuant to the Letter Agreement, Flair agreed to appear the maximum number of 220 Appearance Dates during the first year of its term.

11.

Until April 9, 1998, both parties performed pursuant to the terms of the Letter Agreement. In reliance on Flair's performance and contractual agreement to appear the

3

maximum of 220 dates, WCW has scheduled and wishes to continue to schedule Flair for appearances at events to fulfill his part in appropriate story lines.

12.

Pursuant to the Letter Agreement, Flair was scheduled to appear for WCW's nationally televised "Thunder" program in Tallahassee, Florida on April 9, 1998, which was telecast live. Flair informed WCW that for personal reasons he would not appear at this event. To accommodate Flair, WCW arranged at its expense for a private jet to transport Flair to Tallahassee and back after the show. Despite these arrangements, Flair failed and refused to appear at and perform in this event. Flair's failure to appear caused WCW to have to re-work the content of this live program on extremely short notice.

13.

Flair was next scheduled to appear in Minneapolis, Minnesota on Monday, April 13, 1998 for WCW's nationally televised program "Monday Nitro," which also was telecast live. Flair again failed and refused to appear at and perform in this event.

14.

Flair was next scheduled to appear at a television taping in Mankato, Minnesota on April 14, 1998. Flair again failed and refused to appear at and perform in this event.

15.

On April 15, 1998, Flair was scheduled to appear at a live event that was not televised in Duluth, Minnesota. Flair again refused to appear at and perform in this event.

16.

At the time of Flair's refusal to appear and perform in these events, WCW had been developing a new story line involving several wrestlers. Flair was to be a key participant in this

4

new story line involving the reinstatement of the highly successful "Four Horsemen" wrestling group, of which Flair was to be be the leader. Without Flair, WCW could not introduce this story line which was to culminate in one or more pay-per-view main event matches. Flair's refusal to perform in scheduled events in contravention of his contractual responsibilities significantly disrupted WCW's ability to introduce its planned story line causing significant loss of time, money and effort by WCW.

17.

Flair continues to refuse to perform wrestling and wrestling related services for WCW under the terms of the Letter Agreement.

18.

Upon information and belief, and despite his agreement to wrestle exclusively for WCW through February 16, 2001, Flair has engaged in discussions with WCW's primary competitor, the World Wrestling Federation (the "WWF"), about offering his wrestling services to the WWF. Flair has wrongly asserted that he is not bound by the Letter Agreement in general and, in particular, his agreement to wrestle exclusively for WCW during the term of the Letter Agreement.

19.

WCW stands ready, willing and able to continue to use Flair and continues to compensate him as agreed pursuant to the Letter Agreement.

5

# COUNT I

## BREACH OF CONTRACT - CLAIM FOR DAMAGES

20.

WCW incorporates herein and realleges, as if fully set forth in this paragraph, the allegations contained in paragraphs 1 through 19 above.

21.

WCW hereby expressly affirms the Letter Agreement and reasserts that it has heretofore fully performed and is ready, willing and able to perform thereunder. WCW further shows that it continues to compensate Flair under the terms of the Letter Agreement and maintains that the Letter Agreement remains in force. WCW has performed all conditions precedent in order to proceed with this action and continues to perform in accordance with the Letter Agreement.

22.

Flair's conduct described herein constitutes a material breach of the Letter Agreement. As a result of Flair's breach, WCW has suffered damages in an amount to be proven at trial but not less than $2,000,000.00.

23.

Pursuant to paragraph 8(c) of the Letter Agreement, Flair agreed to indemnify WCW for all costs, losses and reasonable attorneys' fees caused by or resulting from any breach of the Letter Agreement.

24.

As a result of Flair's breach of the Letter Agreement, WCW is entitled to recover all costs, losses, and reasonable attorneys' fees incurred by it in connection with this action in an amount to be proven at trial.

6

## COUNT II

## BREACH OF CONTRACT - CLAIM FOR INJUNCTIVE RELIEF

25.

WCW incorporates and realleges, as if fully set forth in this paragraph, the allegations contained in paragraphs 1 through 24 above.

26.

Pursuant to the Letter Agreement, Flair agreed that he would not provide services to any third party or organization during the term of the Letter Agreement.

27.

Flair, as a professional wrestler, provides services to WCW which are of peculiar merit and character and are of such a nature that they cannot be readily and adequately performed by others. Flair's skills and abilities are special, unique and inimitable; they are much sought after and cannot be replaced by WCW.

28.

WCW has expended significant time and effort and large sums in developing, advertising and promoting Flair and in developing, advertising and promoting events in which Flair is a featured wrestler.

29.

Flair's conduct described herein constitutes a breach of his obligation to provide wrestling and wrestling related services exclusively to WCW during the term of the Letter Agreement.

7

30.

Unless Flair is enjoined from providing wrestling or wrestling related services to any

third party or organization during the term of the Letter Agreement, WCW will suffer substantial

irreparable harm. WCW has no adequate remedy at law.

31.

WCW is entitled to an order enjoining Flair during the pendency of this action and

permanently from providing wrestling or wrestling related services to any third party or

organization during the term of the Letter Agreement.

## COUNT III

## BAD FAITH AND STUBBORN LITIGIOUSNESS

32.

WCW incorporates herein and realleges, as if fully set forth in this paragraph, the

allegations contained in paragraphs 1 through 31 above.

33.

Flair's conduct described herein, including but not limited to his lack of professionalism,

his open disregard for his contractual obligations, and his willful refusal to perform constitute

bad faith and stubborn litigiousness, thereby entitling WCW to recover its attorneys' fees in

connection with this action pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, WCW respectfully requests:

(a)     That pursuant to Count I, this Court enter a judgment for compensatory damages
        in an amount to be proven at trial but not less than $2,000,000.00, plus pre-
        judgment interest at the maximum rate allowed by law;

8

(b)      That pursuant to Count I, this Court enter a judgment granting WCW all costs, losses and reasonable attorneys' fees incurred in connection with this action in an amount to be proven at trial pursuant to paragraph 8(c) of the Letter Agreement;

(c)      That pursuant to Count II, this Court enjoin Flair during the pendency of this action and permanently from providing wrestling or wrestling related services to any third party or organization during the term of the Letter Agreement;

(d)      That pursuant to Count III, this Court grant WCW all of its expenses of litigation, including attorneys' fees, as a result of Defendant's bad faith and stubborn litigiousness;

(e)      That this Court enter a judgment granting WCW all costs incurred in this action;

(f)      That this Court enter a judgment awarding all other interest allowed by law; and

(g)      That this Court grant WCW such other and further relief as this Court deems just and proper.

Respectfully submitted this 14th day of May, 1998.

TROUTMAN SANDERS LLP

JAMES A. LAMBERTH
Georgia Bar No. 431,851
DAVID C. VIGILANTE
Georgia Bar No. 727634

600 Peachtree Street, N.E.
Suite 5200, NationsBank Plaza
Atlanta, GA 30308-2216
(404) 885-3000

0250892.02

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 92 of 162





**WCW**

**A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.**
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366
(404) 827-2066   Fax: (404) 827-2931

November 11, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: **Letter of Agreement**

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World
Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1.   **SERVICES:** During the Term, you will provide wrestling and wrestling related services
required by WCW within the Territory. During the Term, you will not provide services to any
third party or organization in the Territory.

2.   **TERM AND TERRITORY:** The Territory shall be the World. The Term of this
Agreement shall be for three (3) years beginning on February 16, 1998 and continuing through
February 15, 2001.

3.   **CONSIDERATION:** During the term, WCW shall compensate you according to the
following schedule:

Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearance
Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you shall
receive additional compensation at the rate of $3,750 per Appearance Date.

4.   **TRAVEL EXPENSES:** During the Term, when required to travel hereunder for WCW,
WCW shall provide Hotel Accommodations and First Class Air Transportation for all
Appearance Dates outside of your Home Base. In addition, you shall be credited $500.00 per
Appearance Date worked for limousine transportation. The limousine transportation credit
be included in the bi-weekly compensation payments.

5.   **MERCHANDISING:** WCW shall have exclusive licensing and merchandising rights
within the Territory.

6.   **HOME BASE:** Charlotte, North Carolina.

**A Time Warner Company**

7.   **CONFIDENTIALITY:** You shall keep the terms of this agreement confidential and shall not disclose or discuss them with anyone other than your spouse, attorney/agent and or accountant who shall, in turn, agree not to disclose the terms.

8.   **GENERAL TERMS:** (a) You hereby represent and warrant to WCW as follows: (1) You have the full power, authority, ability and legal right to execute and deliver this Agreement and perform your obligations hereunder; (2) this Agreement constitutes your legal, valid and fully binding obligation and is enforceable in accordance with its terms; (3) the execution, delivery and performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorized by the same, will not contravene any law, regulation, judgment or decree applicable to you, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which you are a party, (4) there are no pending claims or litigation which would or might interfere with the performance of your obligations or the enjoyment of WCW's rights under this Agreement; and (5) you are not currently using, and during the Term of this Agreement, shall not use any illegal drugs, steroid or other substances prohibited by WCW.

(b)  You agree to abide by the terms and conditions of the WCW Substance Abuse Policy which you agree you have received and reviewed.

(c)  You agree to indemnify, defend and hold harmless WCW, its directors, officers, shareholders and their respective agents, officers and employees, against any and all suits, damages, expense (including, without limitation, court costs and reasonable attorneys' fees), losses, liabilities and claims of any kind, caused by or resulting from any breach of this agreement or by any other act or omission of yours whether the same may be the result of negligence, willful act, responsibility under strict liability standards any other substandard conduct or otherwise.

*If subject and review and mutual acceptance.* Formal Independent Contractor and Merchandising Agreements containing the terms as set forth above, as well as WCW's standard terms (to the extend they do not conflict with the terms herein), shall be prepared by WCW and signed by the parties. Until such time as such formal agreements are executed by the parties, this Letter of Agreement shall govern and be fully enforceable and legally binding between the parties.

If the foregoing is in accordance with your understanding and agreement, please indicate your approval and acceptance hereof by signing in the space provided below and returning this letter to me.

Sincerely,                                    AGREED TO AND ACCEPTED:

Nicholas Lambros
Vice President/Asst. General Manager          Richard M. Flieh

A Time Warner Company

EXHIBIT B

## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made as of the 16th day of February, 1993, by and between WORLD CHAMPIONSHIP WRESTLING, INC., a Georgia corporation (hereinafter "PROMOTER"), and RICHARD M. FLIEHR (hereinafter "WRESTLER") whose ring name is Ric Flair.

In consideration of the mutual covenants and agreements hereinafter set forth, it is hereby agreed as follows:

### 1.  GRANT OF RIGHTS

1.1  During the term of this Agreement, WRESTLER hereby grants exclusively to PROMOTER the following worldwide rights:

(a)  To book WRESTLER for and to arrange WRESTLER's performance at wrestling events, engagements, promotions, matches and appearances of any type at which WRESTLER appears or performs services as a professional WRESTLER, whether such services include wrestling services or not (collectively, the "Events"), and whether the Events are staged before a live audience, in a broadcast studio (for later, delayed broadcast or otherwise), in any other location or otherwise;

(b)  To sell or otherwise distribute tickets of admission to the general public to any or all of the Events;

(c)  To publish, distribute, broadcast, photograph, film, tape or otherwise record, or to authorize others to do so, by any media now known or hereafter developed, any or all of the Events (any such broadcast, film, tape or other recording is referred to herein as a "Program");

(d)  To use WRESTLER'S name and image to promote, advertise or otherwise publicize the Events, PROMOTER or WRESTLER; and

(e)  To solicit, negotiate and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER's merchandising, commercial tie-in, publishing, endorsement and similar rights, and for personal appearances by WRESTLER and/or WRESTLER's performance in non-wrestling events (collectively referred to as the "Rights") including without limitation agreements involving WRESTLER, his ring name, his likeness and/or any other distinctive or identifying indicia, subject to the terms of that certain Merchandising Permission Agreement of even date hereof and executed concurrently herewith.

1.2  (a)  PROMOTER shall have the perpetual exclusive right to use, exhibit, distribute or license throughout the world any Program or part thereof in which WRESTLER's services are utilized in any form of media which is now known or may hereafter exist, or otherwise exploit such Programs in such forums and for such uses as it deems appropriate.  Except as otherwise specifically set forth hereunder, all revenues derived by PROMOTER from the use, exhibition, distribution, licensing or other exploitation of such Programs shall be the sole and exclusive property of PROMOTER perpetually.

(b)  All Programs, recordings and work product made pursuant to this Agreement and WRESTLER's contributions thereto (hereinafter referred to as "Works") shall belong solely and exclusively to PROMOTER.  To the extent that such Works are considered: (i) contributions to collective works and/or (ii) as parts or components of audio-visual works, the parties hereby

2

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 98 of 162

expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries. WRESTLER shall execute, verify, acknowledge, deliver and file any and all formal assignments, recordations and any and all other documents which PROMOTER may prepare and reasonably call for to give effect to the provisions of this Agreement. To the extent that WRESTLER refuses or is unable to execute such further documents, WRESTLER hereby appoints PROMOTER as his attorney-in-fact for the purposes of executing such documents.

1.3  It is expressly understood that the rights granted to PROMOTER in Paragraph 1.2 shall continue in effect after the termination, expiration or nonrenewal of this Agreement to the extent necessary for PROMOTER's full enjoyment of such rights.

## 2.   TRADEMARK LICENSE

For the term of this Agreement and, as provided hereunder, thereafter, WRESTLER grants to PROMOTER the exclusive license and right to the use of WRESTLER's service marks, trademarks, trade names and any and all of his other distinctive and identifying

3

indicia, including without limitation his name, ring names, likeness, voice, signature, costumes, props, gimmicks, routines, themes, character and caricatures as used by or associated with WRESTLER in the business of professional wrestling (collectively, the "Intellectual Property"). The rights granted PROMOTER hereunder include the right to sublicense, promote, advertise, publicize, exploit and otherwise use the Intellectual Property in any commercial manner now known or hereafter devised. WRESTLER agrees to notify PROMOTER of any unauthorized use of the Intellectual Property promptly as it comes to WRESTLER's attention. PROMOTER shall have the sole and exclusive right to bring claims against such unauthorized infringements and to collect and retain any monetary awards therefrom, which right shall be exercised or not exercised in PROMOTER's sole discretion; provided, however, that WRESTLER shall be entitled to bring any such claims with PROMOTER's written permission should PROMOTER choose not to do so.

### 3. MERCHANDISING RIGHTS

Certain terms of the agreement between WRESTLER and PROMOTER regarding merchandising activities are set forth in that certain Merchandising Permission Agreement of even date hereof and executed concurrently herewith, which is incorporated herein by this reference. In the event of any conflict or discrepancy between the terms hereof and the Merchandising Permission Agreement, the terms hereof shall govern.

4

## 4. EXCLUSIVITY

The rights and licenses granted to PROMOTER by WRESTLER in Paragraphs 1, 2 and 3 hereof, and any and all other rights herein granted to PROMOTER during the term of this Agreement, are exclusive to PROMOTER even to the exclusion of WRESTLER during the term of this Agreement. Notwithstanding the foregoing, it is acknowledged that WRESTLER has granted certain rights and licenses to PROMOTER under a Memorandum of Agreement dated May 1, 1985, as amended, and a Merchandising Permission Agreement dated December 20, 1990, to Baggy Boy's Clothes and to World Wrestling Federation ("WWF") prior to the effective date of this Agreement. WRESTLER agrees to use his best efforts to obtain and provide to PROMOTER copies of agreements and/or other documents evidencing such preexisting rights and licenses. It is further acknowledged that WRESTLER has an ownership interest in Ric Flair's Gold's Gym in Charlotte, North Carolina and has plans to do promotional work for Gold's Gym and to open other gyms and shall be entitled to use and authorize the use of his name, ring name, likeness and voice in connection with the operation and promotion of such businesses and the sale of merchandise in connection therewith. Additionally, WRESTLER may provide occasional professional wrestling services to a bona fide third party wrestling organization other than WWF during the term of this Agreement provided that (i) WRESTLER obtains express prior written permission from PROMOTER in all instances and (ii) the performance of any such other services shall not interfere with WRESTLER's full and timely performance of all of his obligations under this Agreement.

5

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 101 of 162

The expiration, nonrenewal or termination of this or any other agreement shall in no way limit, invalidate or otherwise affect the exclusivity of any rights licensed by PROMOTER during the term hereof (or any extension) to a third party, even if the term of such agreement with such third party continues beyond the date of expiration, nonrenewal or termination of this Agreement. It is the specific intent of this Agreement that any such third party agreement shall remain in full force and effect through its initial term and any renewal thereof, notwithstanding the expiration or termination of this Agreement or the Merchandising Permission Agreement, or any other agreement between the parties.

### 5. TERM AND TERRITORY

5.1  The term of this Agreement shall be three (3) years, from February 16, 1993 through February 15, 1996, unless sooner terminated as hereinafter provided.  The term of this Agreement shall be divided into nine (9) consecutive four (4) month periods ("cycles").  During cycles six (6) through nine (9), PROMOTER or WRESTLER may terminate this Agreement for any reason or no reason after giving to the other party at least thirty (30) days prior written notice of termination, said termination to be effective at the end of the then current (4) month cycle.

5.2  The territory of this Agreement shall be the world.

5.3  Upon giving WRESTLER at least thirty (30) days notice prior to the end of the initial term, PROMOTER shall have the option to extend the term of this Agreement for a period of one (1) year under the same terms and conditions as exist during the

6

initial term including, but not limited to, compensation,
termination, and exclusivity.

## 6.   CONSIDERATION

6.1   (a)   In consideration of WRESTLER's grant of the
rights, licenses and services hereunder, and provided WRESTLER
faithfully and fully performs all of his obligations hereunder,
PROMOTER shall pay WRESTLER at the rate of Five Hundred Thousand
Dollars ($500,000.00) per annum.  It is expressly understood that
this amount shall include compensation for all services and all
merchandising activities involving WRESTLER and WRESTLER shall
not be entitled to any additional compensation or revenues under
this Agreement or the Merchandising Permission Agreement.

(b)   In the event WRESTLER is totally disabled to perform
services hereunder due to an injury or illness in connection with
the performance of services hereunder, as determined by a doctor
selected by PROMOTER, PROMOTER shall pay WRESTLER at the rate of
fifty percent (50%) of the compensation set forth above during
the period of total disability for the lesser of the duration of
such total disability or ninety (90) days.  If, after ninety (90)
days, WRESTLER is unable to or does not resume the full range of
services hereunder, PROMOTER shall not pay WRESTLER any portion
of the compensation set forth above unless and until WRESTLER
resumes the full range of services hereunder, in which case he
shall be compensated pursuant to paragraph 6.1(a), or until he
performs non-wrestling services, in which case the following
sentence shall apply.  In the event WRESTLER is disabled to
wrestle due to an injury or illness in connection with the

7

performance of services hereunder, as determined by a doctor selected by PROMOTER, but performs non-wrestling services as requested by PROMOTER, PROMOTER shall pay WRESTLER at the rate of fifty percent (50%) of the compensation set forth in paragraph 6.1(a) during the period of partial disability for the lesser of the duration of such partial disability or the remainder of the term of this Agreement. PROMOTER shall have no other obligation, liability or responsibility to WRESTLER in connection with any injury, illness or disability resulting from the performance of services hereunder and WRESTLER releases PROMOTER from any claims which may arise in connection therewith. Whenever WRESTLER is unavailable to perform services hereunder due to any other reason, PROMOTER shall be entitled to reduce the compensation hereunder pro-rata for the time WRESTLER is unavailable to PROMOTER.

6.2   PROMOTER shall pay WRESTLER Nine Thousand Dollars ($9,000.00) per annum during the term of this Agreement to be applied by WRESTLER toward his purchase of an insurance policy insuring his income hereunder, such amount to be paid on or about the first day of each year of the term hereof.

6.3   In the event PROMOTER schedules Events for WRESTLER in Japan, WRESTLER may request PROMOTER to pay a bonus in connection with such services of WRESTLER, provided that the decision whether to pay any bonus and the amount thereof shall be at PROMOTER's reasonable discretion.

6.4   PROMOTER shall use its best efforts to schedule and provide WRESTLER seven (7) consecutive days of no services two (2) times per annum.

8

6.5 WRESTLER expressly agrees and acknowledges that in no event shall WRESTLER receive or be entitled to any share of any revenues derived by PROMOTER from any use or other exploitation of any of the Rights and/or the Intellectual Property in any wrestling magazine or other publication published by PROMOTER or any third party in conjunction with PROMOTER, from the sale or licensing in any medium, market or form of videocassettes of any of the Events or from any 800, 900 or 976 telephone call-in lines, or from Pay-Per-View Events.

6.6 WRESTLER acknowledges that he is an independent contractor of PROMOTER and shall be, as between PROMOTER and him, solely responsible and liable for the payment of any and all withholding, employment or other taxes levied, assessed or due as a result of the services which are performed by WRESTLER under this Agreement. PROMOTER shall have the right to withhold taxes from amounts payable to WRESTLER hereunder after any such assessment or if PROMOTER has reasonable grounds to believe that any such assessment will be forthcoming.

6.7 Because WRESTLER is an independent contractor of PROMOTER, PROMOTER shall not provide to WRESTLER any benefits, plans or programs whatsoever which are otherwise available to employees of PROMOTER.

## 7. PROMOTER'S OBLIGATIONS

7.1 During the term of this Agreement, PROMOTER shall bear the costs:

(a) Associated with PROMOTER's staging of Events before a live audience, including costs of location rental, sound and

9

light equipment, wrestling ring, officials, police and fire
protection and such additional security guards as PROMOTER shall
require in its sole discretion, promotional assistance, facility
charges and applicable state and local admission taxes; and

(b)  Associated with the production, distribution and
exploitation of the Events and the Programs.

7.2  (a) PROMOTER shall provide transportation to WRESTLER
according to its customary travel policies for any Event located
in Atlanta, Georgia or in excess of 300 miles from WRESTLER's
designated base.  PROMOTER shall provide WRESTLER with reasonable
advance notice of the date, time and place of any such Event.  In
connection with a "tour" defined as more than two (2) Events
within a consecutive three (3) day period, in which all Events
are in Atlanta or more than 300 miles from WRESTLER's designated
base, PROMOTER shall provide transportation to WRESTLER to return
to his designated base during such tour if he has one (1) or more
days off between consecutive dates on such tour.  For purposes of
this Agreement, WRESTLER's designated base is Charlotte, North
Carolina.

(b)  WRESTLER shall receive an upgrade to first (1st) class
seating for all airline travel in connection with his services
hereunder, provided that, to the extent WRESTLER earns frequent
flyer points through such travel, these points shall be used
first to upgrade WRESTLER's airline seating to first class and
WRESTLER's frequent flyer points earned through such travel shall
be used solely for upgrades and travel hereunder.  WRESTLER will
provide PROMOTER copies of statements reflecting frequent flyer

10

points earned for travel in connection with his services hereunder.

## 8.   WRESTLER'S OBLIGATIONS

8.1   WRESTLER shall appear and perform services as determined and directed by PROMOTER at a maximum of Two Hundred thirty (230) Events per annum.   WRESTLER shall appear at the designated location for any such Event as directed by PROMOTER, but not later than one hour before the designated time.   WRESTLER acknowledges that his failure to appear at least one hour before the designated time or his failure to obtain or to have available and maintain all necessary documents for travel on behalf of PROMOTER (including but not limited to passports and visas), shall subject him to a reasonable penalty, including any monetary penalty, to be determined by PROMOTER in its sole discretion, which shall be deducted from the consideration set forth in Paragraph 6.1.

8.2   WRESTLER shall be responsible, at his sole expense, for supplying all wardrobe, props and make-up necessary for the performance of WRESTLER at any Event at which WRESTLER appears and, for Events occurring no more than 300 miles from WRESTLER'S designated base, except events in Atlanta, any costs incurred in connection with his transportation to and from such Events, as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at any Events. WRESTLER's wardrobe, props and make-up shall comply with PROMOTER's company policy and be subject to PROMOTER's prior approval.

11

8.3  WRESTLER agrees to appear at, cooperate with and assist in Events intended to publicize, advertise and promote wrestling engagements, matches and other Events, including without limitation press conferences, interviews and other publicity, promotional or exploitation appearances or activities, and at times and places designated by PROMOTER in PROMOTER'S sole discretion.  The parties agree that any promotional on non-wrestling Event at which WRESTLER appears for less than (six) 6 hours shall not be counted as an Event for the purposes of Paragraph 8.1.

8.4  WRESTLER acknowledges the right of PROMOTER to make any changes in Events, Programs or any of WRESTLER'S services hereunder, and WRESTLER acknowledges and agrees that PROMOTER'S decision with respect thereto shall be final.

8.5  WRESTLER agrees to cooperate fully and in good faith with PROMOTER in the event PROMOTER deems it necessary to obtain life, disability or other insurance upon WRESTLER in such amount as PROMOTER may determine necessary.  WRESTLER shall submit to physical or other examinations as may be required to obtain any such insurance and shall cooperate in the preparation and execution of applications and other documents as may be required in connection therewith.

8.6  WRESTLER agrees to be examined at PROMOTER'S request by any physician selected by PROMOTER and to execute such releases or to furnish information regarding WRESTLER'S physical and health condition requested by PROMOTER.  In the event of any recovery by WRESTLER against a third party relating to any illness or injury which causes WRESTLER'S inability to provide

12

services hereunder (except for recovery under an insurance policy purchased by WRESTLER), such recovery or portion thereof shall, at PROMOTER'S option, be paid to PROMOTER up to the amount necessary to reimburse PROMOTER to the extent of any payments made by PROMOTER hereunder during the period of WRESTLER'S disability; provided that nothing contained herein shall be deemed to obligate PROMOTER to make any such payments during the period of WRESTLER's disability.

8.7   WRESTLER shall indemnify PROMOTER and its parent, sibling and affiliated entities, licensees and assignees, and the officers, directors, employees, agents and representatives of the foregoing entities, and hold each of them fully harmless from any and all claims, demands, liabilities, actions, costs, suits, proceedings and expenses, whether fixed or contingent, including, without limitation, attorneys fees (including allocable costs of in-house counsel) and costs of action, incurred by any of the foregoing entities or individuals by reason of the breach or alleged breach of any warranty, undertaking, representation, agreement or certification made or entered into herein or hereunder by WRESTLER and/or by reason or arising out of or relating to WRESTLER'S conduct in association with services performed hereunder.  WRESTLER agrees and understands that in the event that WRESTLER shall injure or cause bodily injury to any person outside of the ring, none of the foregoing entities or individuals shall in any event be held liable or otherwise responsible and WRESTLER specifically agrees to indemnify and hold harmless all of the foregoing entities and individuals therefrom.

13

8.8 WRESTLER represents, warrants and agrees that he is free to enter into this Agreement and to grant the rights herein granted to PROMOTER; he has not heretofore entered, and shall not hereafter enter, into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of any of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights granted to it herein; and there are no pending claims or litigation affecting WRESTLER which would or might interfere with the full and complete performance by WRESTLER of any of his obligations hereunder or the full and complete exercise or enjoyment by PROMOTER of any of the rights and licenses granted to it herein.

8.9 WRESTLER agrees that any use of illegal drugs or other substances proscribed by PROMOTER at any time during the term is prohibited under this Agreement. WRESTLER further agrees that whenever requested by PROMOTER, WRESTLER shall submit to a medical examination and/or medical tests and agrees that any use of illegal drugs or other substances as demonstrated by such tests shall be grounds for monetary penalties imposed by PROMOTER, suspension without compensation or immediate termination of this Agreement without notice, as determined by PROMOTER. In the event of such a termination, PROMOTER'S obligations pursuant to Paragraphs 6 and 11.1 hereof shall immediately cease, but all licenses and rights granted by WRESTLER to PROMOTER herein and under the Merchandising Permission Agreement shall continue as set forth in this Agreement.

14

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 110 of 162

8.10  WRESTLER agrees to comply with all reasonable or customary requirements, directions, requests, policies, rules and regulations made by PROMOTER.  WRESTLER agrees to use his best efforts in the performance of services pursuant to this Agreement consistent with the customs of the professional wrestling industry and consistent with the directions and advice of PROMOTER'S match-maker, booker or other representative. WRESTLER'S failure to so perform shall entitle PROMOTER to impose monetary penalties upon WRESTLER in amounts determined by PROMOTER or suspend this Agreement and its obligations pursuant to Paragraphs 6 and 11.1 for a period to be determined solely by PROMOTER.  Alternatively, PROMOTER may immediately terminate this Agreement upon two (2) weeks written notice to WRESTLER.  Any such termination will fully release PROMOTER from all further obligations to WRESTLER, except for any consideration that has theretofore accrued pursuant to Paragraph 6 hereto, but all licenses and rights granted by WRESTLER to PROMOTER herein and under the Merchandising Permission Agreement shall continue as set forth in this Agreement.

## 9.  TERMINATION

9.1  This Agreement may be terminated for any material breach as set forth elsewhere herein.  Additionally, if WRESTLER fails to perform any of his duties or obligations hereunder or pursuant hereto in good faith, or otherwise breaches any material provision hereof or of the Merchandising Permission Agreement, PROMOTER may impose monetary penalties upon WRESTLER in amounts determined by PROMOTER or may suspend this Agreement and its

15

obligations for a period to be determined solely by PROMOTER. Alternatively, PROMOTER may in such a case immediately terminate this Agreement upon two (2) weeks written notice to WRESTLER. Any such termination will fully release PROMOTER from all further obligations to WRESTLER, except for any consideration that has theretofore accrued pursuant to Paragraph 6, but all licenses and rights granted by WRESTLER to PROMOTER herein and under the Merchandising Permission Agreement shall continue as set forth in this Agreement.

9.2  This Agreement may be terminated by a written instrument executed by the parties expressing their mutual consent to so terminate without any further liability on the part of either.  In the event of such early termination, the earnings guaranteed pursuant to Paragraph 6 and 11.1 of this Agreement shall be prorated to the actual date of termination.

9.3  This Agreement shall terminate automatically in the event of WRESTLER's death.  In that event, PROMOTER shall be released from all further obligations except for any consideration that has theretofore accrued pursuant thereto, and except for its obligation to pay merchandising royalties, which shall continue in perpetuity.  All licenses and rights granted to PROMOTER herein shall continue as set forth in this Agreement.

## 10.  BREACH

10.1  No failure by PROMOTER to perform any obligation hereunder shall be deemed a breach hereof unless and until WRESTLER shall have notified PROMOTER in writing of such alleged breach and PROMOTER shall have failed to cure such alleged breach

16

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 112 of 162

within fifteen (15) days from receipt of such written notice.
Only if PROMOTER fails to cure within such time period or if the
breach is not curable, may WRESTLER seek to recover such damages
as may be established in any court of law having jurisdiction of
the parties and the subject matter.

10.2  In the event of WRESTLER'S breach, WRESTLER agrees to
pay PROMOTER a royalty of sixty percent (60%) of all monies and
all other consideration earned and derived by WRESTLER from the
rendering of any wrestling or other licensed services, the
merchandising of WRESTLER'S ring name and/or likeness or from the
exercise of any other rights granted to PROMOTER under this
Agreement for the remainder of what would have been the term
hereof.  WRESTLER hereby authorizes any person, firm or entity
owing or paying WRESTLER for any of such services or for any of
such merchandising activities or exercise of such rights in
breach of this Agreement to pay such royalties directly to
PROMOTER upon receipt of a copy of this Agreement, and to provide
PROMOTER with any and all business records and documents
concerning the sources, nature and amount of such revenues.  For
the remainder of what would have been the term hereof, WRESTLER
shall not appear under or use in any manner whatsoever his ring
name or any different name confusingly similar thereto, or
otherwise use or exploit any of the Rights or the Intellectual
Property.

10.3  The parties further agree, notwithstanding the royalty
provided for above, that because of the special, unique and
extraordinary nature of the services to be rendered by WRESTLER
hereunder and of the rights and licenses which are the subject

17

matter of this Agreement, PROMOTER shall be entitled to
injunctive and other equitable relief to prevent any breach or
default by WRESTLER hereunder, and such relief shall be without
prejudice to any other rights or remedies of PROMOTER as may be
provided by law.

### 11. MISCELLANEOUS

11.1 Nothing herein shall be deemed to obligate PROMOTER to
use WRESTLER's services in any Events or otherwise and PROMOTER
shall have fully discharged its obligations to WRESTLER by
providing the compensation specified in Paragraph 6.

11.2 This Agreement and the Merchandising Permission
Agreement contain the entire understanding of the parties with
respect to the subject matter hereof and, except as otherwise set
forth herein, all prior understandings and negotiations will have
been merged herein. There are no other agreements,
representations or warranties, whether written, oral or
otherwise, not set forth herein with respect to the subject
matter hereof, and this Agreement may not be changed or altered
except by an agreement in writing signed by both PROMOTER and
WRESTLER. This Agreement and the Merchandising Permission
Agreement supersede and cancel any prior agreement between the
parties hereto concerning the subject matter hereof, with the
exception of the provisions of the Memorandum of Agreement dated
May 1, 1985, as amended, that relate to merchandising payments,
and the Merchandising Permission Agreement dated December 20,
1990. Notwithstanding the foregoing, this Agreement shall not
supersede or affect any agreement entered into between the

18

parties with respect to the use by Promoter or the use by a third party of the Intellectual Property.

11.3  A waiver by either party of any Paragraph, term or condition of this Agreement in any instance shall not be deemed or construed to be a waiver of such Paragraph, term or condition for the future or of any subsequent breach thereof, and any such waiver must be in writing.  All rights and remedies contained in this Agreement are cumulative and none of them shall be construed so as to limit any other right or remedy of either party.

11.4  In the event any part or parts hereof are declared invalid or unenforceable, such part or parts shall be considered deleted and such declaration shall not affect the remaining provisions hereof.

11.5  PROMOTER shall have the right to assign, license or transfer this Agreement and/or any or all of the rights granted to it hereunder or any or all of its obligations provided herein to any entity or corporation and, if any such assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER thereafter shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate any of his rights or obligations hereunder.

11.6  Any notices required to be given hereunder shall be in writing and shall be delivered personally or sent postage prepaid by certified mail, return receipt requested, and addressed as follows or as the parties hereafter in writing otherwise may designate:

19

if to PROMOTER:

> World Championship Wrestling, Inc.
> One CNN Center
> Box 105366
> Atlanta, Georgia  30348-5366
> Attention: Mr. Bill Watts

with a copy to:

> Ginger S. McRae, Esq.
> Assistant General Counsel
> Turner Broadcasting System, Inc.
> One CNN Center
> Box 105366
> Atlanta, Georgia  30348-5366

if to WRESTLER:

> Richard M. Fliehr
> 2722 Plantation Road
> Charlotte, NC  28270

with a copy to:

> Thomas E. Beck
> 808 Raleigh Road
> Glenview, Illinois  60025

The date of mailing or of personal delivery, as the case may be, shall be deemed to constitute the date of service of any such notice.

11.7  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia.  The parties hereto agree that the state or federal courts located in Atlanta, Georgia shall have personal jurisdiction over them with respect to, and shall be the exclusive forum for the resolution of, any matter of controversy or dispute arising from or with respect to this Agreement.  Service of a summons and complaint concerning any such matter of controversy or dispute may, in addition to any other lawful means, be effected by sending a copy of such summons

20

and complaint by certified mail to the party to be served as specified above or at such other address as the party to be served shall have provided in writing to the other party from time to time in accordance herewith.

11.8  All remedies set forth herein or otherwise available to either party hereunder shall be cumulative and no one remedy shall be exclusive of any other.

11.9  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

"PROMOTER"
WORLD CHAMPIONSHIP WRESTLING, INC.

By:_____

Its:_____


"WRESTLER"

_____
RICHARD M. FLIEHR

\mcrae\agrees\wcw-fliehr.aa

21

## AMENDMENT

This amendment ("Amendment") has been entered into as of the 21st day of October, 1994 by and between WORLD CHAMPIONSHIP WRESTLING, INC. ("WCW") and RICHARD M. FLIEHR ("Fliehr") with reference to that certain Independent Contractor Agreement dated as of February 16, 1993 between WCW and Fliehr (the "Agreement").

In consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WCW and Fliehr agree to amend and modify the Agreement as follows:

1.   The defined term "WRESTLER" as set forth in paragraph 1 and appearing throughout the Agreement, shall be revised mutatis mutandis, to "WRESTLER/TALENT COORDINATOR".

2.   The following shall be inserted at the end of paragraph 1:

     (f)  To utilize the services of WRESTLER/TALENT COORDINATOR to provide wrestler and other talent coordination, booking and other such services.

3.   Paragraph 5.1 shall be amended to read as follows:

     The term of this Agreement shall be four (4) years, from February 16, 1993 through February 15, 1997, unless sooner terminated as hereinafter provided.

4.   The third sentence of paragraph 6.1 (b) is hereby deleted.

5.   The first sentence of paragraph 8.1 shall be amended to read as follows:

     WRESTLER/TALENT COORDINATOR shall appear and perform wrestling services as determined and directed by PROMOTER at a maximum of Two Hundred Thirty (230) Events per annum.

6.   The following shall be added to the end of paragraph 8.1:

     WRESTLER/TALENT COORDINATOR shall appear and perform talent coordinator/booking services as determined and directed by PROMOTER.

This Amendment to the Agreement shall only serve to amend and modify the Agreement to the extent specifically provided herein. All terms, conditions, provisions and references of and to the

1

Agreement which are not specifically modified and/or amended herein shall remain in full force and effect and shall not be affected by any provisions herein contained.

As hereby amended, the Agreement is ratified and reaffirmed in its entirety and shall remain in full force and effect. In the event of any conflict or inconsistency between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

RICHARD M. FLIEHR

WORLD CHAMPIONSHIP WRESTLING, INC.

By: _____

Title: _____

0034890.01

2

TOTAL P.04

## SECOND AMENDMENT

This second amendment ("Second Amendment") has been entered into
as of the 24th day of May, 1996 by and between WORLD CHAMPIONSHIP
WRESTLING, INC. ("WCW") and Richard M. Fliehr pka Ric Flair
("Wrestler") with reference to that certain Independent
Contractor Agreement dated February 16, 1993 ("Agreement") and
the subsequent Amendment dated October 21, 1994 between WCW and
Wrestler ("Amendment").

In consideration of the mutual promises herein contained and for
other good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, WCW and Wrestler
agree to amend and modify Paragraph 5.1 of the Agreement and
Paragraph 3 of the Amendment as follows:

> The term of this Agreement shall be five (5) years, from
> February 16, 1993 through February 15, 1998, unless
> sooner terminated as hereinafter provided.

This Second Amendment to the Agreement and the Amendment shall
only serve to amend and modify the Agreement and the Amendment to
the extent specifically provided herein. All terms, conditions,
provisions and references of and to the Agreement and the
Amendment which are not specifically modified and/or amended
herein shall remain in full force and effect and shall not be
affected by any provisions herein contained.

As hereby amended, the Agreement and the Amendment are ratified
and reaffirmed in their entirety and shall remain in full force
and effect.  In the event of any conflict or inconsistency
between the provisions of the Agreement and the Amendment and the
provisions of this Second Amendment, the provisions of this
Second Amendment shall control.

RICHARD M. FLIEHR                    WORLD CHAMPIONSHIP WRESTLING,
                                     INC.

_____              By: _____

                                     Title: _____

TOTAL P.02

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a copy of the foregoing

AMENDED COMPLAINT upon the interested parties by placing a copy thereof in the United

States mail with adequate postage thereon and addressed as follows:

William K. Diehl, Jr., Esq.
James, McElroy & Diehl, P.A.
600 South College Street
Charlotte, North Carolina 28202

This 14th day of May, 1998.

JAMES A. LAMBERTH
Georgia Bar No. 431851

TROUTMAN SANDERS LLP
600 Peachtree Street, N.E.
Suite 5200, NationsBank Plaza
Atlanta, GA 30308-2216
(404) 885-3000

0250892.02

10

GEORGIA, FULTON COUNTY
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE COMPLETE AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS BY THE ORIGINAL ON FILE IN THE OFFICE OF CLERK OF FULTON SUPERIOR COURT, CONSISTING OF 38 PAGES.
WITNESS MY HAND AND THE SEAL OF SAID COURT THIS THE 4th DAY OF August 1998

Denise L. Anderson
DEPUTY CLERK, FULTON SUPERIOR COURT

JUANITA HICKS
CLERK OF THE SUPERIOR COURT
OF FULTON COUNTY, GEORGIA

APR 2 9 1998
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

WORLD CHAMPIONSHIP
WRESTLING, INC.,

      PLAINTIFF,

VS.

RICHARD M. FLIEHR, a/k/a
RIC FLAIR,

      DEFENDANT.

)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION
NUMBER E 67920

**AFFIDAVIT OF SERVICE**

I, _GARY S. Aull_,
hereby say that I am a citizen of the United States, am more
than eighteen (18) years of age, am not an interested party
in the above-styled action, am allowed by the State of North
Carolina to serve process
and that on _April 21_, 1998, at _10:25_ am/pm I served
RICHARD M. FLIEHR, a/k/a RIC FLAIR

_____ By PERSONAL Service

__X__ OR By Personally Serving _Pat Fliehr_

Who is _the wife_

AT _2722 Plantation Road, Matthews, N.C. 28270_

with the following: Summons and Complaint.

I certify under penalty of perjury that the
foregoing is true and correct.

Executed on this _21st_ day of _April_, 1998

_Gary S. Aull_
Process Server
MLQ ATTORNEY SERVICES
3200 Cobb Galleria Pkwy
Building 200, Suite 225
Atlanta, Georgia 30339
(770) 984-7007

Subscribed and sworn to before me this _23_ day of
_April_, 1998, and notarized by me on said date.

_____
NOTARY PUBLIC 9-6-2006

GEORGIA, FULTON COUNTY
I, DO CERTIFY THAT THE WITHIN AND FOREGOING IS A TRUE COMPLETE AND CORRECT COPY OF THE ORIGINAL IN SAID CASE, AS APPEARS BY THE ORIGINAL ON FILE IN THE OFFICE OF CLERK OF FULTON SUPERIOR COURT, CONSISTING OF 1 PAGES.
WITNESS MY HAND AND THE SEAL OF SAID COURT THIS THE 4th DAY OF August 19 98

[signature]
DEPUTY CLERK, FULTON SUPERIOR COURT

JUANITA HICKS
CLERK OF THE SUPERIOR COURT
OF FULTON COUNTY, GEORGIA

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
                                                    SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG                        98-CVS-_8351_

RICHARD M. FLIEHR, a/k/a Ric Flair,      )
                                         )
            Plaintiff,                   )
                                         )        **COMPLAINT**
v.                                       )
                                         )        **[Jury Trial Demanded]**
WORLD CHAMPIONSHIP                       )
WRESTLING, INC.,                         )
                                         )
            Defendant.                   )

Plaintiff, complaining of Defendant, alleges and says:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff is an adult citizen and resident of Mecklenburg County.

2.      Defendant is a corporation existing under the laws of the State of Georgia, but doing business in North Carolina.

3.      This is an action for declaratory judgment and for damages in excess of $10,000.

4.      Jurisdiction and venue are proper in this court since Plaintiff resides in Mecklenburg County and Defendant does business here.

## FACTS

5.      Plaintiff is a well-known professional wrestler. He has wrestled for 25 years, and has been a champion on thirteen separate occasions.

6.      Defendant organizes and promotes wrestling events.

7.      On February 16, 1993, Plaintiff entered into a contract to wrestle for Defendant. The contract was 21 pages long, contains 11 sections and 51 subsections.

8.      The agreement, as amended, expired on February 15, 1998.

JMD: 158974                           1

9. Plaintiff began negotiating with Defendant regarding a new contract in the fall of 1996 and continuing throughout 1997.

10. Plaintiff informed Defendant during the negotiations that he sought a three year agreement providing him a substantial income; a working environment and relationship with the WCW of fair treatment; reasonable involvement in the "story lines" part of professional wrestling; legitimate consideration of his twenty-five years of experience and his status as one of the most popular wrestlers in the world.

11. Defendant assured Plaintiff that he would be provided all of the above as he requested, and further, that he would be treated during the three year period of a contract as the "Babe Ruth" of professional wrestling.

12. Plaintiff relied upon the promises and assurances of the Defendant.

13. Defendant sent a "proposed agreement" letter to Plaintiff on November 11, 1997 outlining "skeleton" terms of a future arrangement between the parties. (Exhibit A).

14. Plaintiff was assured by Defendant that Exhibit A was nothing more than an outline of basic economic terms of a future relationship between the parties. As set forth in Exhibit A two comprehensive documents were to describe the actual contractual relationship between the parties.

15. Plaintiff wanted to approve the comprehensive documents setting forth the contractual relationship between the parties, before he signed the more comprehensive documents. Accordingly, Plaintiff noted on the second page of Exhibit A (see Exhibit B), that the more comprehensive documents would be "subject to review and mutual acceptance" and initialed that note.

16. Defendant received Exhibit A with the additional written language described above and then executed Exhibit A. As executed by both parties, Exhibit A became Exhibit B, attached.

17. On or about January 18, 1998, Defendant sent two draft agreements to Plaintiff's agents in Los Angeles. The draft agreements were not acceptable to Plaintiff. Among other things, the agreements:

a. Failed to contain paragraphs recognizing Plaintiff's experience and status as an internationally known wrestling champion;

b. Failed to contain paragraphs involving Plaintiff in the "story line" of his wrestling matches;

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 126 of 162

c.    Failed to include requirements that the WCW and its representatives deal with Plaintiff in the operation of their business relationship in a civil and respectful manner;

d.    Contained new "agreements" never agreed to by the parties;

e.    Failed to contain provisions allowing reasonable vacation time;

f.    Failed to include provisions permitting Plaintiff to wrestle on a regular basis and containing provisions allowing the WCW to eliminate Plaintiff as a wrestler for three years if they paid him, literally destroying his career;

g.    Contained provisions not agreed to allowing Defendant (and others) to retain rights belonging to Plaintiff, beyond the term of the agreement;

h.    Contained provisions not agreed to requiring Plaintiff to indemnify Defendant for breaches of contract, but not providing for the reverse.

i.    Containing provisions allowing Defendant to cure alleged breaches, but not permitting Plaintiff to cure breaches;

j.    Failed to provide payments to Plaintiff in the event of his disability or incapacitation;

k.    Provided Plaintiff, an amount, not agreed to, less than the contract sum in the event Plaintiff were hurt, but prevented Plaintiff from working in another field to earn a living;

l.    Provided that Plaintiff had a sole remedy in the event of injury to accept workman's compensation and then provided that Defendant didn't have to carry workman's compensation insurance;

m.    Included an illegal non-compete clause after termination of the agreement "for any reason", including breach by Defendant;

n.    Permitted Defendant to assign the agreement without consent of Plaintiff;

o.    Required Plaintiff to license his name and wrestling titles exclusively to Defendant and permitted Defendant to sublicense Plaintiff's name without his consent; and

p.    Failed to provide adequate examination of Defendant's books and records to determine sums due Plaintiff under any licensing agreements.

18.    Plaintiff has not and will not execute the proposed comprehensive agreements.

19.    The parties continued their negotiations after January. During these negotiations, the parties' relationship deteriorated drastically. Defendant reduced the number of Plaintiff's appearances at its promotions. Plaintiff's appearances on Defendant's weekly television programs, "Thunder", "Nitro" and Pay Per View were de-emphasized and for over a month, completely eliminated. Upon information and belief, Plaintiff's role in such event was downplayed by Defendant's agents, in particular, Eric Bischoff, in order to satisfy demands made by, and commitments to, other wrestlers, including Terry "Hollywood" Hogan. Bischoff is purportedly Vice President of Defendant in charge of wrestling and simultaneously the self styled public spokesman and TV personality manager for one or more WCW wrestlers, including the "New World Order" and "Hollywood Hogan."

20.    Throughout the time period, Bischoff has been treating Plaintiff, off camera, in an increasingly hostile, rude, threatening and degrading manner.  Bischoff asserts himself as a "czar" and seems to believe he has dictatorial authority over Plaintiff.  His language is crude, rude and "socially unacceptable" even in the world of professional wrestling.  He has threatened to bankrupt Plaintiff, put Plaintiff out of work, banish him to some foreign country and has referred to him as "garbage."

21.    An actual controversy exists between the parties. Defendant has filed an action in Fulton County Superior Court in Atlanta, Georgia, alleging that Exhibit B constitutes a binding agreement, that Plaintiff has breached it, and that Defendant is entitled to damages in excess of $2,000,000.

### FIRST CAUSE OF ACTION
### Declaratory Judgment

22.    Paragraphs 1 through 21 are restated and realleged as if fully set out.

23.    Pursuant to N.C.G.S. §1-253, Plaintiff is entitled to a declaration that the document attached as Exhibit B is not a binding agreement between the parties, and does not obligate the parties in any way, and there are no contractual relationships between Plaintiff and Defendant.

### SECOND CAUSE OF ACTION
### Interference With Prospective
### Economic Advantage

24.    Paragraphs 1 through 23 are restated and realleged as if fully set out.

25.    Defendant's primary competitor is known as the World Wrestling Federation ("the WWF").

26. Upon information and belief, Defendant is aware that Plaintiff had discussions with the WWF after it became clear that Plaintiff and Defendant would not finalize an agreement.

27. Defendant's filing of the civil action in state court in Georgia is groundless, and, upon information and belief, is intended to chill any further discussions between Plaintiff and the WWF.

28. Upon information and belief, the WWF is not willing to enter into any agreement with Plaintiff during the pendency of this litigation. Plaintiff has suffered damage as a result.

29. Plaintiff's exact loss is as yet undetermined, but upon information and belief, it will exceed $2,000,000.

## THIRD CAUSE OF ACTION
### Unfair Trade Practices

30. Paragraphs 1 through 29 are restated and realleged as if fully set out.

31. Defendant's actions are, in and affecting, commerce.

32. Defendant's actions are unfair and deceptive, and are proscribed by N.C.G.S. §75-1.1.

33. Plaintiff has suffered damage as a result.

34. Plaintiff's exact loss is as yet undetermined, but upon information and belief, it will exceed $2,000,000.

## FOURTH CAUSE OF ACTION (ALTERNATIVE)
### Recission/Reformation

35. Paragraphs 1 through 34 are restated and realleged as if fully set out.

36. Plaintiff signed Exhibit B based on assurances by Defendant's agents that final agreements between the parties containing certain provisions would be executed at a later date.

37. Upon information and belief, these representations were false when made, and Defendant had no intentions of fulfilling its promises.

38. Defendant intended for Plaintiff to rely on these representations.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 129 of 162

39. Plaintiff in fact relied on these representations to his detriment in signing Exhibit B.

40. If the Court should hold that the letter attached as Exhibit B is a binding agreement, Plaintiff is entitled to an order rescinding it, or in the alternative, reforming the document to reflect the true agreement of the parties.

## FIFTH CAUSE OF ACTION (ALTERNATIVE)
### Breach of Contract

41. Paragraphs 1-40 are restated and realleged as if fully set out.

42. If the Court should hold that Exhibit B is a binding agreement, Defendant has breached it as set forth in paragraph 19.

43. Plaintiff has suffered damage as a result in an amount to be determined at trial, but, upon information and belief, in excess of $2,000,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court:

1. To enter a judgment declaring that Exhibit B does not bind the parties and there are no contractual relations between Plaintiff and Defendant;

2. In the alternative, to rescind any agreement represented by Exhibit B as fraudulently induced, or to reform it to reflect the true agreement of the parties;

3. To conduct a hearing on Plaintiff's first cause of action at the Court's earliest convenience, pursuant to Rule 57 of the North Carolina Rules of Civil Procedure;

4. For damages in excess of $10,000;

5. To treble any damage award;

6. To tax the costs of this action, including a reasonable attorneys' fee, against Defendant;

7. For a trial by jury for causes of action 2, 3, 4, and 5 but not the request for declaratory judgment;

8. For such other relief as the Court deems appropriate.

This ___1___ day of June, 1998.

JAMES, McELROY & DIEHL, P.A.

By: _William K. Diehl, Jr. by RBF_
    William K. Diehl, Jr.

By: _Richard Fennell_
    Richard B. Fennell
    600 South College Street
    Charlotte, NC 28202
    Telephone: 704/372-9870
    Attorneys for Plaintiff

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 131 of 162


A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER. Box 105366, Atlanta, GA 30348-5366
(404) 827-2066   Fax: (404) 827-2931

November 5, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: <u>Letter of Agreement</u>

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World
Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1.   <u>SERVICES:</u>  During the Term, you will provide wrestling and wrestling related services as
required by WCW within the Territory. During the Term, you will not provide services to any
third party or organization in the Territory.

2.   <u>TERM AND TERRITORY:</u>  The Territory shall be the World. The Term of this
Agreement shall be for three (3) years beginning on February 16, 1998 and continuing through
February 15, 2001.

3.   <u>CONSIDERATION:</u>  During the term, WCW shall compensate you according to the
following schedule:

   Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
   Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
   Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

   The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearance
   Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you shall
   receive additional compensation at the rate of $3,750 per Appearance Date.

4.   <u>TRAVEL EXPENSES:</u>  During the Term, when required to travel hereunder for WCW,
WCW shall provide Hotel Accommodations and First Class Air Transportation for all
Appearance Dates outside of your Home Base. In addition, you shall be credited $400.00 per
Appearance Date worked for limousine transportation. The limousine transportation credit shall
be included in the bi-weekly compensation payments.

5.   <u>MERCHANDISING:</u>  WCW shall have exclusive licensing and merchandising rights
within the Territory.

6.   <u>HOME BASE:</u>  Charlotte, North Carolina.

EXHIBIT

A

A Time Warner Company

7. **CONFIDENTIALITY:** You shall keep the terms of this agreement confidential and shall not disclose or discuss them with anyone other than your spouse, attorney/agent and or accountant who shall, in turn, agree not to disclose the terms.

8. **GENERAL TERMS:** (a) You hereby represent and warrant to WCW as follows: (1) You have the full power, authority, ability and legal right to execute and deliver this Agreement and to perform your obligations hereunder; (2) this Agreement constitutes your legal, valid and fully binding obligation and is enforceable in accordance with its terms; (3) the execution, delivery and performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorized by the same, will not contravene any law, regulation, judgment or decree applicable to you, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which you are a party; (4) there are no pending claims or litigation which would or might interfere with the performance of your obligations or the enjoyment of WCW's rights under this Agreement; and (5) you are not currently using, and during the Term of this Agreement, shall not use any illegal drugs, steroids or other substances prohibited by WCW.

(b) You agree to abide by the terms and conditions of the WCW Substance Abuse Policy which you agree you have received and reviewed.

(c) You agree to indemnify, defend and hold harmless WCW, its directors, officers, shareholders and their respective agents, officers and employees, against any and all suits, damages, expenses (including, without limitation, court costs and reasonable attorneys' fees), losses, liabilities and claims of any kind, caused by or resulting from any breach of this agreement or by any other act or omission of yours whether the same may be the result of negligence, willful act, responsibility under strict liability standards any other substandard conduct or otherwise.

Formal Independent Contractor and Merchandising Agreements containing the terms as set forth above, as well as WCW's standard terms (to the extend they do not conflict with the terms herein), shall be prepared by WCW and signed by the parties. Until such time as such formal agreements are executed by the parties, this Letter of Agreement shall govern and be fully enforceable and legally binding between the parties.

If the foregoing is in accordance with your understanding and agreement, please indicate your approval and acceptance hereof by signing in the space provided below and returning this letter to me.

Sincerely,                                    AGREED TO AND ACCEPTED:



Nicholas Lambros
Vice President/Asst. General Manager        Richard M. Fliehr

**WCW**

A SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER, Box 105366, Atlanta, GA 90348-5366
(404) 827-2066   Fax (404) 827-2931

November 11, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: Letter of Agreement

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1.   **SERVICES:** During the Term, you will provide wrestling and wrestling related services required by WCW within the Territory. During the Term, you will not provide services to an third party or organization in the Territory.

2.   **TERM AND TERRITORY:** The Territory shall be the World. The Term of this Agreement shall be for three (3) years beginning on February 16, 1998 and continuing through February 15, 2001.

3.   **CONSIDERATION:** During the term, WCW shall compensate you according to the following schedule:

   Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
   Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
   Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

   The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearance Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you shall receive additional compensation at the rate of $3,750 per Appearance Date.

4.   **TRAVEL EXPENSES:** During the Term, when required to travel hereunder for WCW, WCW shall provide Hotel Accommodations and First Class Air Transportation for all Appearance Dates outside of your Home Base. In addition, you shall be credited $500.00 per Appearance Date worked for limousine transportation. The limousine transportation credit be included in the bi-weekly compensation payments.

5.   **MERCHANDISING:** WCW shall have exclusive licensing and merchandising rights within the Territory.

6.   **HOME BASE:** Charlotte, North Carolina.



EXHIBIT

B

**ORIGINAL**

FILED IN OFFICE

JUN 15 1998

DEPUTY CLERK
FULTON CO

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

WORLD CHAMPIONSHIP WRESTLING, INC.,)
                      )
       Plaintiff,       )
                      )
v.                     )      CIVIL ACTION
                      )      FILE NO. E-67920
RICHARD M. FLIEHR a/k/a RIC FLAIR, )
                      )
       Defendant.       )
_____/

### ANSWER AND COUNTERCLAIM

COMES NOW Defendant Richard M. Fliehr a/k/a Ric Flair ("Mr. Flair") and hereby states his Answer to Plaintiff World Championship Wrestling, Inc.'s ("WCW") Complaint and Amended Complaint and states Mr. Fair's Counterclaim against WCW as follows:

### ANSWER

#### FIRST DEFENSE

The Complaint and Amended Complaint fail to state a claim upon relief can be granted.

#### SECOND DEFENSE

The Complaint and Amended Complaint are for breach of an alleged contract referred to as the "Letter Agreement" by WCW and attached to the Complaint and Amended Complaint as Exhibit A. Exhibit A, however, is nothing more than an agreement to agree in the future, and, as such, it is not an enforceable contract under Georgia law.

## THIRD DEFENSE

The alleged contract, Exhibit A to the Complaint and Amended Complaint, is not sufficiently definite to enforce.

## FOURTH DEFENSE

Exhibit A to the Complaint and Amended Complaint is not a contract because there was never a meeting of the minds of the parties on all of the alleged contract's essential terms.

## FIFTH DEFENSE

Count II of the Complaint and Amended Complaint seeks specific performance of an alleged contract for personal services, but, under Georgia law, specific performance is not an available remedy for an alleged breach of a personal services contract.

## SIXTH DEFENSE

The Complaint and Amended Complaint are barred by the doctrine of estoppel.

## SEVENTH DEFENSE

The Complaint and Amended Complaint are barred by the doctrine of laches.

## EIGHTH DEFENSE

The Complaint and Amended Complaint are barred by the doctrine of waiver.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 136 of 162

## NINTH DEFENSE

With respect to the specifically numbered paragraphs in the Complaint and Amended Complaint, Mr. Flair responds as follows:

### 1.

Mr. Flair admits the allegation in Paragraph 1 of the Complaint and Amended Complaint.

### 2.

In response to the allegations in Paragraph 2 of the Complaint and Amended Complaint, Mr. Flair admits that he is a resident of the State of North Carolina and that he may be served at his address of 2722 Plantation Road, Matthews, North Carolina, 28270. Mr. Flair denies the remaining allegations in Paragraph 2 of the Complaint and Amended Complaint.

### 3.

Mr. Flair denies the allegations in Paragraph 3 of the Complaint and Amended Complaint.

### 4.

Mr. Flair admits the allegations in Paragraph 4 of the Complaint and Amended Complaint, as far as he knows.

### 5.

Mr. Flair admits the allegations in Paragraph 5 of the Complaint and Amended Complaint, except that Mr. Flair states that he has wrestled for WCW since 1988, with the exception of approximately one and one-half years, and, further, that story

-3-

lines are sometimes developed in advance.

6.

Mr. Flair denies the allegations in Paragraph 6 of the Complaint and Amended Complaint, except that Mr. Flair admits that a copy of the November 11, 1997 letter referred to was attached to Mr. Flair's copy of the Complaint and Amended Complaint.

7.

In response to the allegations contained in Paragraph 7 of the Complaint and Amended Complaint, Mr. Flair denies that the letter referred to constitutes a contract or an agreement.  Mr. Flair admits the remaining allegations contained in Paragraph 7 of the Complaint and Amended Complaint.

8.

In response to the allegations contained in Paragraph 8 of the Complaint and Amended Complaint, Mr. Flair states that the letter referred to is a written document that speaks for itself. In response to additional allegations contained in Paragraph 8 of the Complaint, Mr. Flair admits that a true and correct copy of the draft Independent Contractor Agreement was attached to Mr. Flair's copy of the Complaint as Exhibit C.  Mr. Flair denies the remaining allegations in Paragraph 8 of the Complaint and Amended Complaint.

-4-

9.

In response to the allegations contained in Paragraph 9 of
the Complaint and Amended Complaint, Mr. Flair states that the
letter referred to will speak for itself.

10.

In response to the allegations contained in Paragraph 10 of
the Complaint and Amended Complaint, Mr. Flair states that the
letter referred to will speak for itself.

11.

In response to the allegations contained in Paragraph 11 of
the Complaint and Amended Complaint, Mr. Flair denies that the
letter referred to constitutes a contract or an agreement. By
way of further answer, Mr. Flair denies that WCW performed
pursuant to the terms of the letter referred to. Mr. Flair is
without knowledge or information sufficient to form a belief as
to the truth of the remaining allegations contained in Paragraph
11 of the Complaint and Amended Complaint.

12.

Mr. Flair denies the allegations in Paragraph 12 of the
Complaint and Amended Complaint.

13.

Mr. Flair denies the allegations in Paragraph 13 of the
Complaint and Amended Complaint.

14.

Mr. Flair denies the allegations in Paragraph 14 of the Complaint and Amended Complaint.

15.

Mr. Flair admits the allegations in Paragraph 15 of the Complaint and Amended Complaint.

16.

The allegations contained in Paragraph 16 of the Complaint have been deleted from the Amended Complaint and, accordingly, require no response from Mr. Flair. To the extent that any response is required, Mr. Flair denies the allegations in Paragraph 16 of the Complaint.

17.

Mr. Flair denies the allegations in Paragraph 17 of the Complaint and Paragraph 16 of the Amended Complaint.

17a.

In response to the allegations contained in Paragraph 17 of the Amended Complaint, Mr. Flair denies that the letter referred to constitutes a contract or an agreement. Mr. Flair admits the remaining allegations contained in Paragraph 17 of the Amended Complaint.

18.

Mr. Flair denies the allegations in Paragraph 18 of the Complaint and Amended Complaint.

-6-

## 19.

Mr. Flair denies the allegations in Paragraph 19 of the Complaint and Amended Complaint.

### COUNT I

## 20.

The allegations in Paragraph 20 of the Complaint and Amended Complaint require no response.

## 21.

Mr. Flair denies the allegations in Paragraph 21 of the Complaint and Amended Complaint.

## 22.

Mr. Flair denies the allegations in Paragraph 22 of the Complaint and Amended Complaint.

## 23.

Mr. Flair denies the allegations in Paragraph 23 of the Complaint and Amended Complaint.

## 24.

Mr. Flair denies the allegations in Paragraph 24 of the Complaint and Amended Complaint.

### COUNT II

## 25.

The allegations in Paragraph 25 of the Complaint and Amended Complaint require no response.

26.

In response to the allegations contained in Paragraph 26 of the Complaint and Amended Complaint, Mr. Flair states that the letter referred to is a written document that will speak for itself.

27.

Mr. Flair denies the allegations in Paragraph 27 of the Amended Complaint as stated.

28.

Mr. Flair denies the allegations in Paragraph 28 of the Amended Complaint.

29.

Mr. Flair denies the allegations in Paragraph 27 of the Complaint and Paragraph 29 of the Amended Complaint.

30.

Mr. Flair denies the allegations in Paragraph 30 of the Amended Complaint.

31.

Mr. Flair denies the allegations in Paragraph 28 of the Complaint and Paragraph 31 of the Amended Complaint.

<u>COUNT III</u>

32.

The allegations in Paragraph 29 of the Complaint and Paragraph 32 of the Amended Complaint require no response.

-8-

33.

Mr. Flair denies the allegations in Paragraph 30 of the Complaint and Paragraph 33 of the Amended Complaint.

34.

Mr. Flair hereby denies all allegations contained in the Complaint and in the Amended Complaint not specifically responded to in this Answer.


WHEREFORE, Mr. Flair respectfully requests that the Court dismiss the Complaint and Amended Complaint, that judgment be entered against Plaintiff in favor of Mr. Flair, that costs be awarded against Plaintiff and in favor of Mr. Flair, and that the Court grant such other and further relief to Mr. Flair as may be just and proper.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 143 of 162

<u>COUNTERCLAIM</u>

1.

By bringing the Complaint and Amended Complaint in this Court, Plaintiff WCW is subject to the jurisdiction and venue of this Court for purposes of this Counterclaim by Mr. Flair.

<u>FACTS</u>

2.

Mr. Flair is a well-known professional wrestler. He has wrestled for 25 years, and has been a champion on thirteen separate occasions.

3.

WCW organizes and promotes wrestling events.

4.

On February 16, 1993, Mr. Flair entered into a contract to wrestle for WCW. That contract was 21 pages long and contained 11 sections and 51 subsections.

5.

The February 16, 1993 agreement between Mr. Flair and WCW, as amended, expired on February 15, 1998.

6.

Mr. Flair began negotiating with WCW regarding a new contract in the fall of 1996 and continuing throughout 1997.

7.

Mr. Flair informed WCW during the negotiations that he

-10-

sought a three year agreement providing him a substantial income; a working environment and relationship with WCW of fair treatment; reasonable involvement in the "story lines" part of professional wrestling; legitimate consideration of his twenty-five years of experience and his status as one of the most popular wrestlers in the world.

8.

WCW assured Mr. Flair that he would be provided all of the above as he requested, and, further, that he would be treated during the three-year period of a contract as the "Babe Ruth" of professional wrestling.

9.

Mr. Flair relied upon the promises and assurances of WCW described herein.

10.

WCW sent a "proposed agreement" letter to Mr. Flair on or about November 11, 1997 outlining "skeleton" terms of a future arrangement between the parties.

11.

A true and correct copy of WCW's November 11, 1997 letter to Mr. Flair is attached to the Complaint and Amended Complaint as Exhibit A, is attached hereto as Exhibit A, and is hereinafter referred to as "Exhibit A."

12.

WCW assured Mr. Flair that Exhibit A was nothing more than an outline of basic economic terms of a future relationship between the parties. As set forth in Exhibit A, two comprehensive documents were to follow Exhibit A and would describe the actual contractual relationship between the parties.

13.

Naturally, Mr. Flair wanted to read and approve the comprehensive documents setting forth the contractual relationship between the parties, before he signed the more comprehensive documents. Accordingly, Mr. Flair noted on the second page of Exhibit A, that the comprehensive documents would be "subject to review and mutual acceptance" and initialed that note.

14.

A true and correct copy of Exhibit A with Mr. Flair's notation is attached hereto as Exhibit A.

15.

WCW received Exhibit A with the additional written language described above and then executed Exhibit A.

16.

WCW intended and agreed that the comprehensive documents would be subject to review and acceptance by WCW before WCW would execute them.

-12-

17.

On or about January 18, 1998, WCW sent two draft agreements to Mr. Flair's agents in Los Angeles. The draft agreements were not acceptable to Mr. Flair. Among other things, the draft agreements:

a. Failed to contain paragraphs recognizing Mr. Flair's experience and status as an internationally known wrestling champion;

b. Failed to contain paragraphs involving Mr. Flair in the "story line" of his wrestling matches;

c. Failed to include requirements that WCW and its representatives deal with Mr. Flair in the operation of their business relationship in a civil and respectful manner;

d. Contained new provisions never discussed by the parties;

e. Failed to contain provisions allowing reasonable vacation time;

f. Failed to include provisions permitting Mr. Flair to wrestle on a regular basis and contained provisions allowing the WCW to eliminate Mr. Flair as a wrestler for three years as long as WCW paid him (such a three-year hiatus would destroy Mr. Flair's career);

g. Contained provisions not acceptable to Mr. Flair allowing WCW (and others) to retain rights belonging to Mr. Flair

-13-

beyond the term of the agreement;

h.    Contained provisions not acceptable to Mr. Flair requiring Mr. Flair to indemnify WCW for breaches of contract, but not providing for the reverse;

i.    Contained provisions allowing WCW to cure alleged breaches, but not permitting Mr. Flair to cure breaches;

j.    Failed to provide payments to Mr. Flair in the event of his disability or incapacitation;

k.    Provided Mr. Flair, an amount, not acceptable to Mr. Flair and less than the contract sum, in the event Mr. Flair were hurt, but prevented Mr. Flair from working in another field to earn a living;

l.    Provided that Mr. Flair had a sole remedy in the event of injury to accept workman's compensation and then provided that WCW did not have to carry workman's compensation insurance;

m.    Included an illegal non-compete clause after termination of the agreement "for any reason," including breach by WCW;

n.    Permitted WCW to assign the agreement without consent of Mr. Flair;

o.    Required Mr. Flair to license his name and wrestling titles exclusively to WCW and permitted WCW to sublicense Mr. Flair's name without his consent; and

-14-

p.   Failed to provide adequate examination of WCW's books and records to determine sums due Mr. Flair under any licensing agreements.

18.

Mr. Flair has not and will not execute the proposed comprehensive agreements.

19.

The parties continued their negotiations after January 1998. During these negotiations, the parties' relationship deteriorated drastically.  WCW reduced the number of Mr. Flair's appearances at its promotions.  Mr. Flair's appearances on WCW's weekly television programs, "Thunder", "Nitro" and Pay-Per-View were de-emphasized and, for over a month, completely eliminated.

20.

Upon information and belief, Mr. Flair's role in such events were downplayed by WCW's agents, in particular, Eric Bischoff, in order to satisfy demands made by, and commitments to, other wrestlers, including Terry "Hollywood" Hogan.

21.

Bischoff is purportedly Vice-President of WCW in charge of wrestling and simultaneously the self-styled public spokesman and TV personality manager for one or more WCW wrestlers, including the "New World Order" and Terry "Hollywood" Hogan.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 149 of 162

22.

Throughout the time period of negotiation, Bischoff has been treating Mr. Flair, off camera, in an increasingly hostile, rude, threatening and degrading manner. Bischoff asserts himself as a "czar" and seems to believe he has dictatorial authority over Mr. Flair. Bischoff's language toward Mr. Flair is rude, crude, and socially unacceptable, even in the world of professional wrestling. Among other things, Bischoff has threatened to bankrupt Mr. Flair, put Mr. Flair out of work, banish him to a foreign country, and has referred to Mr. Flair as "garbage."

23.

WCW in this matter in its dealings with Mr. Flair has acted in bad faith, has been stubbornly litigious, and has caused Mr. Flair unnecessary trouble and expense.

24.

The actions of WCW have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

25.

WCW has acted with the specific intent to cause harm to Mr. Flair.

-16-

## COUNT ONE

### (Declaratory Judgment)

26.

The allegations contained in all of the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

27.

There exists an actual controversy between the parties with respect to their rights, status, and other legal relations, among other things, with respect to whether Exhibit A constitutes a binding agreement.

28.

Pursuant to O.C.G.A. Title 9, Chapter 4, Mr. Flair is entitled to a judgment against WCW declaring, among other things, that the document attached to the Complaint, Amended Complaint, and hereto as Exhibit A is not a binding agreement between the parties; that said document does not obligate the parties in any way; and that there are no contractual relationships between Mr. Flair and WCW.

## COUNT TWO

### (Tortious Interference)

29.

The allegations contained in all of the preceding paragraphs are incorporated herein by reference as if fully set forth at

-17-

length.

30.

WCW's primary competitor is known as the World Wrestling Federation ("WWF").

31.

Upon information and belief, WCW is aware that Mr. Flair had discussions with the WWF after it became clear that Mr. Flair and WCW would not finalize an agreement.

32.

Further, upon information and belief, WCW's filing of the instant civil action was intended to chill any further discussions and business relations between Mr. Flair and the WWF.

33.

Upon information and belief, WWF is not willing to enter into any agreement with Mr. Flair during the pendency of the dispute between Mr. Flair and WCW.

34.

Thus, Mr. Flair had an advantageous business relationship with WWF, and, upon information and belief, WWF desired to and intended to do business with Mr. Flair.

35.

In the absence of any justification, privilege, or authorization by Mr. Flair, WCW intentionally and directly interfered with Mr. Flair's business relationship with WWF,

-18-

thereby causing damage to Mr. Flair and entitling Mr. Flair to a judgment against WCW for compensatory and punitive damages in an amount to be proven at trial.

<div align="center">

COUNT THREE

(Deceptive Trade Practices)

36.

</div>

The allegations contained in all of the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

<div align="center">

37.

</div>

By, among other things, intentionally disparaging the services and business of Mr. Flair, WCW has engaged in unfair and deceptive trade practices in violation of O.C.G.A. § 10-1-370 et seq., thereby causing damage to Mr. Flair and entitling Mr. Flair to injunctive relief, an award of attorneys' fees, and to a judgment against WCW for compensatory and punitive damages in an amount to be proven at trial.

<div align="center">

COUNT FOUR

(Litigation Expenses)

38.

</div>

The allegations contained in all of the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

<div align="center">

-19-

</div>

39.

By means of the wrongful conduct described above, WCW has acted in bad faith, has been stubbornly litigious, and has caused Mr. Flair unnecessary trouble and expense, such that, pursuant to O.C.G.A. § 13-6-11, Mr. Flair is entitled to recover from WCW his expenses of litigation, including his attorneys' and experts' fees and expenses.

## COUNT FIVE (ALTERNATIVE)

(Recision/Reformation)

40.

The allegations contained in all of the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

41.

Mr. Flair signed Exhibit A based on assurances by WCW's agents that final agreements between the parties containing certain provisions would be executed at a later date.

42.

Upon information and belief, these representations by WCW were false when made, and WCW had no intention of fulfilling its promises.

43.

WCW intended for Mr. Flair to rely on these representations.

-20-

44.

Mr. Flair in fact relied on these representations to his detriment in signing Exhibit A.

45.

If for any reason the Court should hold that Exhibit A is a binding agreement, which it is not, Mr. Flair is entitled to an order rescinding such agreement, or, in the alternative, reforming the document to reflect the true agreement of the parties.

<u>COUNT SIX (ALTERNATIVE)</u>

(Breach of Contract)

46.

The allegations contained in all of the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

47.

If for any reason the Court should hold that Exhibit A is a binding agreement, which it is not, and, further, if the Court should for any reason hold that Mr. Flair is not entitled to rescind that agreement on account of fraud in the inducement as prayed for in the previous Count, then WCW has breached the agreement in the ways descried in Paragraph 17 above.

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 155 of 162

Mr. Flair has suffered damage as a result of said breach in an amount to be proven at trial.

WHEREFORE, Mr. Flair respectfully requests that the Court:

A. Enter a judgment declaring that the document that is attached as Exhibit A to the Complaint, Amended Complaint, and hereto does not bind the parties and that there are no contractual relations between Mr. Flair and WCW;

B. Grant judgment against WCW in favor of Mr. Flair for the amount of damages sustained by Mr. Flair as determined at trial;

C. Grant judgment against WCW in favor of Mr. Flair for punitive damages in an amount to be determined at trial;

D. Enjoin WCW from further violation of Georgia's Uniform Deceptive Trade Practices Act with respect to Mr. Flair;

E. Grant judgment against WCW in favor of Mr. Flair for Mr. Flair's expenses of litigation, including attorneys' and experts' fees and expenses;

F. In the alternative, to rescind any agreement represented by Exhibit A as fraudulently induced, or, in the alternative, to reform said document to reflect the true agreement of the parties;

G. Tax the costs of this action against WCW;

Case 3:98-cv-00287-GCM   Document 1   Filed 07/10/98   Page 156 of 162

H.   Grant Mr. Flair a trial by jury on all matters so triable; and

I.   Grant Mr. Flair such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Attorney for Defendant
RICHARD M. FLIEHR a/k/a RIC FLAIR

**John L. Taylor, Jr.**
Georgia Bar No. 700400
**Otto F. Feil**
Georgia Bar No. 257288
**Jeff T. Coleman**
Georgia Bar No. 177619
CHOREY, TAYLOR & FEIL, P.C.
Suite 1700, The Lenox Bldg.
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone:  404-841-3200


OF COUNSEL:

**William K. Diehl, Jr.**
**Richard B. Fennell**
JAMES, McELROY & DIEHL, P.A.
600 South College Street
Charlotte, NC  28202
Telephone:  704-372-9870

**WCW**

SUBSIDIARY OF TURNER BROADCASTING SYSTEM, INC.
NE CNN CENTER, Box 105366, Atlanta, GA 30348-5366
(404) 827-2066   Fax (404) 827-2931

November 11, 1997

Mr. Richard M. Fliehr
2722 Plantation Road
Matthews, NC 28270

Re: Letter of Agreement

Dear Ric:

This letter shall confirm the principal terms of the agreement reached between you and World Championship Wrestling, Inc. ("WCW") regarding your services to be provided to WCW:

1.  **SERVICES:** During the Term, you will provide wrestling and wrestling related services required by WCW within the Territory. During the Term, you will not provide services to any third party or organization in the Territory.

2.  **TERM AND TERRITORY:** The Territory shall be the World. The Term of this Agreement shall be for three (3) years beginning on February 16, 1998 and continuing through February 15, 2001.

3.  **CONSIDERATION:** During the term, WCW shall compensate you according to the following schedule:

    Year 1: $725,000   Maximum Number of Appearance Dates: 220 (exclusive of travel)
    Year 2: $725,000   Maximum Number of Appearance Dates: 210 (exclusive of travel)
    Year 3: $500,000   Maximum Number of Appearance Dates: 200 (exclusive of travel)

    The Year 3 compensation of $500,000 shall compensate you for the first 130 Appearance Dates in Year 3. For any Appearance Dates between 131 and 200 during Year 3, you shall receive additional compensation at the rate of $3,750 per Appearance Date.

4.  **TRAVEL EXPENSES:** During the Term, when required to travel hereunder for WCW, WCW shall provide Hotel Accommodations and First Class Air Transportation for all Appearance Dates outside of your Home Base. In addition, you shall be credited $500.00 per Appearance Date worked for limousine transportation. The limousine transportation credit will be included in the bi-weekly compensation payments.

5.  **MERCHANDISING:** WCW shall have exclusive licensing and merchandising rights within the Territory.

6.  **HOME BASE:** Charlotte, North Carolina.

EXHIBIT _A_

7.   **CONFIDENTIALITY:**  You shall keep the terms of this agreement confidential and shall not disclose or discuss them with anyone other than your spouse, attorney/agent and or accountant who shall, in turn, agree not to disclose the terms.

8.   **GENERAL TERMS:**  (a) You hereby represent and warrant to WCW as follows: (1) You have the full power, authority, ability and legal right to execute and deliver this Agreement and perform your obligations hereunder; (2) this Agreement constitutes your legal, valid and fully binding obligation and is enforceable in accordance with its terms; (3) the execution, delivery and performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorized by the same, will not contravene any law, regulation, judgment or decree applicable to you, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which you are a party, (4) there are no pending claims or litigation which would or might interfere with the performance of your obligations or the enjoyment of WCW's rights under this Agreement; and (5) you are not currently using, and during the Term of this Agreement, shall not use any illegal drugs, steroids or other substances prohibited by WCW.

(b)  You agree to abide by the terms and conditions of the WCW Substance Abuse Policy which you agree you have received and reviewed.

(c)  You agree to indemnify, defend and hold harmless WCW, its directors, officers, shareholders and their respective agents, officers and employees, against any and all suits, damages, expenses (including, without limitation, court costs and reasonable attorneys' fees), losses, liabilities and claims of any kind, caused by or resulting from any breach of this agreement or by any other act or omission of yours whether the same may be the result of negligence, willful act, responsibility under strict liability standards any other substandard conduct or otherwise.

*if subject to review and mutual acceptance*

Formal Independent Contractor and Merchandising Agreements containing the terms as set forth above, as well as WCW's standard terms (to the extend they do not conflict with the terms herein), shall be prepared by WCW and signed by the parties. Until such time as such formal agreements are executed by the parties, this Letter of Agreement shall govern and be fully enforceable and legally binding between the parties.

If the foregoing is in accordance with your understanding and agreement, please indicate your approval and acceptance hereof by signing in the space provided below and returning this letter to me.

Sincerely,                                           AGREED TO AND ACCEPTED:


Nicholas Lambros                                     Richard M. Flehr
Vice President/Asst. General Manager

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

WORLD CHAMPIONSHIP WRESTLING, INC., )
                       )
         Plaintiff,         )
                       )
v.                         )        CIVIL ACTION
                       )        FILE NO. E-67920
RICHARD M. FLIEHR A/K/A RIC FLAIR, )
                       )
         Defendant.        )
_____/

## CERTIFICATE OF SERVICE

     I hereby certify that I have this day caused to be served a

true and correct copy of the within and foregoing ANSWER AND

COUNTERCLAIM by U.S. mail as follows:

                 James A. Lamberth, Esquire
                 David C. Vigilante, Esquire
                 TROUTMAN SANDERS LLP
                 600 Peachtree Street, N.E.
                 Suite 5200, NationsBank Plaza
                 Atlanta, Georgia 30308-2216

                 Counsel for Plaintiff

     This    1ˢᵗ    day of June, 1998.

                           Attorney for Defendant
                           RICHARD M. FLIEHR a/k/a RIC FLAIR

**John L. Taylor, Jr.**
Georgia Bar No. 700400
**Otto F. Feil**
Georgia Bar No. 257288
**Jeff T. Coleman**
Georgia Bar No. 177619
CHOREY, TAYLOR & FEIL, P.C.
Suite 1700, The Lenox Bldg.
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: 404-841-3200

16TH CASE of Level 2 printed in FULL format.

BERENGERE **COPELAND,** Plaintiff-Appellant, v. SEAN SPENCER **COPELAND,** husband of plaintiff **Copeland,** Defendant-Appellee.

No. 97-1665

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 1670

November 18, 1997, Submitted

**February 6, 1998, Decided**

NOTICE: [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

SUBSEQUENT HISTORY: Reported in Table Case Format at: *1998 U.S. App. LEXIS 4847.*

PRIOR HISTORY: Appeal from the United States District Court for the Western District of North Carolina, at Bryson City. Lacy H. Thornburg, District Judge. (CA-97-49-2).

DISPOSITION: AFFIRMED.

CORE TERMS: custody, abstention, abstain, filed suit, federal action, adjudicating, litigate, federal forum, custody proceeding, piecemeal

COUNSEL: Ruth Anne Cresenzo, Greensboro, North Carolina, for Appellant.

James M. Spiro, Sylva, North Carolina, for Appellee.

JUDGES: Before WILKINS, NIEMEYER, and WILLIAMS, Circuit Judges.

OPINION: PER CURIAM:

Appellant Berengere Copeland ("Berengere") appeals from a district court judgment finding that extraordinary circumstances compelled abstention from adjudicating her action calling for the return of her minor son to France under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), *42 U.S.C. §§ 11601*-11610

(1995). For the reasons set forth below, we affirm.

Appellant, a French citizen, and Appellee, Sean Copeland ("Sean"), a United States citizen, were married in 1992 in Florida. In 1995, Sean filed suit in North Carolina state court seeking [*2] a divorce and custody of the couple's five year old son, Marc Copeland ("Marc"). At the time Sean filed suit Marc was staying with him in North Carolina. Berengere then moved for the return of Marc to France under the Hague Convention and the ICARA, alleging that Marc was a habitual resident of France. While her motion was pending, Berengere, who had been living in France but was in North Carolina, absconded to France with Marc. The state court then denied Berengere's motion to have Marc returned to France, finding that Sean's retention of Marc while his suit was pending did not amount to a violation of the Hague Convention or the ICARA. The court also entered a temporary custody order granting Sean custody of Marc. Sean then traveled to France and brought Marc back to North Carolina. *

* Berengere alleges that Sean kidnaped Marc and brought him to the United States in violation of her rights of custody under French law and a French court order awarding her temporary custody of Marc.

Berengere did not appeal [*3] the state court ruling but instead filed suit in federal district court pursuant to the Hague Convention and ICARA seeking the prompt return of Marc to France. The district court decided that the action was a parallel proceeding to the state custody proceeding Sean filed in 1995 and thus found that judicial administration warranted that it abstain from adjudicating the controversy.

Under exceptional circumstances, a district court may abstain from adjudicating a controversy before it "for reasons of wise judicial administration." *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817-18, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976).* Before determining that abstention is warranted, the district court must first determine whether the state and federal proceedings are parallel. *New Beckley Mining Corp. v. International Union, United Mine Workers of Am. , 946 F.2d 1072, 1073 (4th Cir. 1991).* "Suits are parallel if substantially the same parties litigate substantially the same issues in different forums." Id. Once the court determines if the proceedings in state court and federal court are parallel, the Court must consider those factors set forth in Colorado [*4] *River, and Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983),* to determine if the circumstances are such that it is proper for the court to abstain. "The factors to be considered include the following: (a) the assumption by either court of jurisdiction over property; (b) the inconvenience of the federal forum; (c) the desire to avoid piecemeal litigation; (d) the order in which the courts obtained jurisdiction; and (e) the source of applicable law." *Colorado River, 424 U.S. at 818; New Beckley Mining Corp., 946 F.2d at 1073-74* (citing *Moses H. Cone, 460 U.S. 1 at 15-16, 23).* An appellate court reviews the district court's decision to surrender jurisdiction under the Colorado River doctrine of abstention for abuse of discretion. *New Beckley Mining Corp. , 946 F.2d at 1074.*

Berengere's contention that the district court erred by determining that the state court proceeding and the federal action before it were parallel proceedings is without merit. In both the state custody proceeding filed in 1995 and her federal action, Berengere raises claims pursuant to the Hague Convention and ICARA alleging that under [*5] international law Marc properly should be living with her in France. Thus, Berengere is attempting to litigate "substantially" the same issues in federal court as she presented in state court. As the district court noted, the state action is still pending and Berengere is free to present further claims in support of her contentions to that tribunal. In addition, the two cases involve the same parties. Therefore, the district court correctly determined that the two proceedings are parallel.

Having determined that the proceedings are parallel, the district court properly applied the Colorado River factors to determine if exceptional circumstances warranted abstention. The district court determined that: (1) the state court assumed jurisdiction over the matter two years prior to the commencement of the federal action; (2) the geographic location of the federal forum was no less convenient to either party than the state forum; (3) abstention would promote the objective of avoiding piecemeal litigation; and (4) although Berengere's claim is nominally "international," it does not involve foreign-relations subject matter and thus is appropriate for adjudication in state court. Because [*6] the district court gave careful consideration to the Colorado River factors as they apply in this case and articulated the above findings in support of its decision, this Court finds that the district court did not abuse its discretion by deciding to abstain from considering the matter.

Accordingly, the judgment of the district court is affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED